**In re AMBAC FINANCIAL GROUP, INC. SECURITIES LITIGATION.**

**No. 08 Civ. 411(NRB).**

United States District Court, S.D. New York.

Feb. 22, 2010.

Opinion Denying Certification of Order for Interlocutory Appeal April 29, 2010.

---

Frederic S. Fox, Esq., Melinda D. Rodon, Esq., Kaplan, Fox & Kilsheimer LLP, Steven B. Singer, Esq., Lauren A. McMillen, Esq., Bernstein, Litowitz, Berger & Grossman LLP, New York, NY, for Plaintiffs.

Peter C. Hein, Esq., Warren R. Stern, Esq., Joshua A. Naftalis, Esq., C. Lee Wilson, Esq., Wachtell, Lipton, Rosen & Katz, New York, NY, for Ambac.

Charles E. Davidow, Esq., Brad S. Karp, Esq., Joyce S. Huang, Esq., Douglas M. Pravda, Esq., Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for the Underwriters.

Michael R. Young, Esq., Antonio Yanes, Jr., Esq., Todd G. Cosenza, Esq., Willkie, Farr & Gallagher LLP, New York, NY, for KMPG.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

Plaintiffs bring this securities class action under Sections 11, 12, and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l and 77o; Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5. Plaintiffs filed a Consolidated Amended Class Action Complaint (the "CAC") on August 25, 2008.

Plaintiffs are investors in Ambac Financial Group, Inc. ("Ambac"), who purchased or acquired (1) Ambac stock during the period from October 25, 2006, through and including April 22, 2008 (the "Class Period"), or (2) securities issued pursuant to certain Ambac registration statements described below. Lead Plaintiffs, appointed pursuant to an order of this Court on May 9, 2008, 2008 WL 2073931, are a group of institutional investors comprised of the Public School Teachers' Pension and Retirement Fund of Chicago, the Arkansas Teachers' Retirement System, and the Public Employees' Retirement System of Mississippi, (collectively, "Lead Plaintiffs"). The CAC also names an additional plaintiff, Painting Industry Insurance and Annuity Funds, whose separately filed case was subsequently consolidated pursuant to our order of October 22, 2008.

Defendants are Ambac, several of Ambac's officers and directors (the "Individual Defendants"), Ambac's auditor (KPMG) and the underwriters of Ambac's securities offerings in February 2007 and March 2008 (the "Underwriter Defendants"). Before the Court are defendants' motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, filed August 27, 2009. For the reasons stated below, the defendants' motions are granted in part and denied in part.

## FACTUAL BACKGROUND

The following facts are taken from the CAC, written instruments attached to the CAC, statements or documents incorporated into the CAC by reference, public disclosure documents required to be filed with the SEC, and documents upon which plaintiffs relied in bringing the suit. The Court may consider such documents on a motion to dismiss. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007). The Court assumes all alleged facts to be true for the purpose of deciding these motions to dismiss, and con-

strues all alleged facts in the light most favorable to the plaintiffs. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir.2006).

## I. Ambac and the Credit Derivative Market

### A. Ambac's Historic Business

Ambac is a holding company with numerous subsidiaries that provide financial guarantee products and other financial services to clients in both the public and private sectors. Its common stock is traded on the New York Stock Exchange. Ambac was founded in 1971 as the first company to offer insurance on municipal bonds. Ambac became known as a "monoline" insurer because it provided one type of insurance—a guarantee to protect against credit risk, *i.e.* the risk of default. Ambac's business model has always been based on establishing underwriting guidelines and procedures that enable the company to guarantee only those obligations that were "of investment grade quality with a remote risk of loss." [1]

In the years leading up to the Class Period, the focus of Ambac's business shifted from insuring municipal bonds towards providing insurance and default protection for structured financial products. While Ambac's exposure to municipal bonds remained roughly constant, Ambac's total insured portfolio grew rapidly, due mostly to the company's structured finance division. CAC ¶¶ 69–70. As a result, Ambac's exposures to public finance shrank from 85% of the company's insured portfolio in 1997, to 35% of the portfolio in 2007. *Id.*

## B. Residential Mortgage Backed Securities ("RMBS")

An RMBS is a debt security that receives cash inflows directly from underlying pools of residential mortgages.[2] CAC ¶ 43. Banks form RMBS by first purchasing mortgages from lenders or originating them directly, then compiling those mortgages into RMBS. The underlying mortgages are grouped into different classes, called "tranches," according to their expected risk of default. The riskiest tranches are, at least by design, the first to default, while the less risky—and thus higher rated—tranches are less likely to suffer losses caused by defaults within the underlying mortgage pool. RMBS are sold in these different tranches, priced according to the expected risk of default associated with the particular tranch. CAC ¶¶ 44–46.

The monthly interest and principal payments on the mortgages are pooled and paid to the holders of RMBS, *i.e.* the bondholders. If mortgage defaults cause losses in the pool, such losses are first allocated to "excess spread" and then to "overcollateralization"—mechanisms built into the securities to protect bondholders from facing losses. If losses exceed the amount of excess spread and overcollateralization, the losses are allocated to bondholders according to the risk profile of each tranch. The holders of bonds with the lowest credit rating face losses first, while AAA bondholders face losses last. CAC ¶ 45. If an entity holds less-risky, investment-grade tranches of RMBS, they are said to be protected by "subordination," *i.e.* the fact that subordinate bondholders will face losses first. CAC ¶ 47.

---

**1.** This quoted phrase appears in Ambac's Form 10–Ks for the years ended December 31, 2005, 2006, 2007, 2008, and 2009.

**2.** Ambac's public filings and statements made by Ambac's officers also refer to Asset–Backed Securities ("ABS"), a broader category of securities that includes RMBS as well as securities backed by collateral other than residential mortgages. The narrower category of RMBS was a major locus of the recent economic downturn, and is what is at issue here. *See* CAC ¶ 107.

Ambac provided insurance against the risk of default on RMBS, but did not originate or underwrite mortgages or compile RMBS.

## C. Collateralized Debt Obligations ("CDOs")

A CDO is a derivative security that receives cash inflows from asset-backed securities, including RMBS, or from other CDOs that are themselves funded by asset-backed securities. A CDO that receives cash inflows in part from other CDOs is known as a "CDO squared." CAC ¶ 48. To form CDOs, banks bought RMBS from mortgage originators and then created and issued CDOs. CAC ¶ 50. The CDO structuring process allowed lower-rated tranches of RMBS to be compiled into pools, thereby restructuring the cash flows so that other CDO tranches could be labeled as investment grade. A core assumption in this restructuring is that, between similarly rated RMBS tranches, there would be a limited correlation of defaults in the underlying mortgage collateral. If most or all of the similarly rated RMBS tranches supporting a CDO suffered defaults at the same time, the protective benefits of subordination would prove illusory.

Ambac issued default protection for CDOs in the form of credit default swaps ("CDS"). As a result, Ambac became the ultimate holder of risk for the mortgages at the bottom of these structured financial products. CAC ¶ 44. When Ambac wrote traditional insurance, regulation required it to allocate approximately 3% of the amount insured to support its capital cushion. CAC ¶ 65. However, when Ambac wrote CDS against CDOs, the amount of capital it had to allocate to the transaction was lower, even if the size of the deal and premium paid to Ambac were the same. *Id.* Thus, writing CDS was potentially more profitable to Ambac than traditional insurance. The danger to the company's viability of taking losses on CDO deals was also heightened, due to the smaller capital cushion in place relative to the amount of risk insured.

By the beginning of the Class Period, Ambac had increased its focus on guaranteeing CDOs. Looking at Ambac's "new business guaranteed" by bond type for 2004, 2005, and 2006, the percentage of CDO guarantees increased from 6% to 33% over the two year period.[3] Additionally, Ambac's CDO deals contained increasing amounts of RMBS collateral. Ambac's net exposure to CDOs with greater than 25% RMBS as the underlying collateral increased from $900 million in 2004 (5.8% of Ambac's domestic CDO exposure) to $29 billion as of December 31, 2007 (57.5% of domestic CDO exposure).[4] CAC ¶ 66. Most of the CDOs Ambac was exposed to were "synthetic CDOs." CAC ¶ 54. A synthetic CDO magnifies the risk of underperformance of the underlying RMBS because payment to the CDO depends in part on cash flows from complex derivatives whose value depends on the performance of the same underlying collateral. Thus, investments in synthetic CDO instruments lowered Ambac's diversification by "doubling down" on the same underlying securities. *Id.*

Generally Accepted Accounting Principles ("GAAP") required Ambac to record the total value of its CDS contracts at fair value as part of the company's quarterly financial disclosure.[5] CAC ¶¶ 270–71. The price of a CDS is set by the expected

---

3. *See* Ambac Form 10–K for the year ended December 31, 2006.

4. *See* Ambac Form 10–Ks for the years ended December 31, 2004 and 2007.

5. *See* Financial Accounting Standards Board "Statement of Financial Accounting Standards" ("SFAS"), 107, 133.

likelihood of a default and the probable amount of the loss, or the "loss severity." CAC ¶ 272. The "value" of the swap is the difference between the premiums the issuer—here, Ambac—will receive and the likely default payments it will make; as the amount of the anticipated default payments increases, the value of the swap decreases. *Id.* GAAP required Ambac to take "write-downs" based on any increased chance that Ambac would have to perform *on* its obligation. CAC ¶¶ 273–76.

### D. Ambac's AAA Credit Rating

In each of the fourteen years prior to 2008, credit rating agencies Standard & Poors (S & P), Moody's, and Fitch had all assigned Ambac a credit rating of AAA (or the equivalent top rating). CAC ¶ 32. This credit rating was essential to Ambac's business model because, in acting as an insurer of financial products, the company effectively sold its AAA credit rating to enhance the credit rating of bonds and asset-backed securities. CAC ¶ 34. Through a financial guarantee insurance contract—known as a "wrap"—Ambac enhanced a security's credit rating by "lending" its own AAA rating to the security and assuming the security's credit risk. This allowed an issuer to save money by lowering the interest rate it had to pay to investors. CAC ¶ 33. The investment community understood the importance of a top credit rating to monoline insurers. For example, in June 2005, a Euromoney article on monoline insurers noted that "[t]here is no AA+ for these guys, it's AAA or nothing." CAC ¶ 34.

Rating agencies assign ratings to bond insurers based on proprietary models that measure, among other characteristics, the

capital adequacy of financial guarantors under stress scenarios. In order to preserve its credit rating, Ambac was required to have a capital cushion, *i.e.* to maintain capital levels at or in excess of the amounts set by each rating agency.[6]

Ambac's loss reserves and insured exposures, detailed in the company's quarterly disclosures, were particularly important to the rating agencies and the investing community because of their impact on Ambac's capital cushion. CAC ¶ 36. Ambac's total capital was only a fraction of its total amount of insured obligations, so any marked increase in losses would place the adequacy of Ambac's capital cushion, and ultimately its AAA rating, at risk. For example, the ratio of Ambac's net financial guarantees to qualified statutory capital (its "capital ratio") was 125:1 as of March 31, 2007. CAC ¶ 37. Since the failure of a small amount of Ambac's insured portfolio would be enough to wipe out Ambac's excess capital, the quality of the company's underwriting and monitoring of its risk exposures was very important to investors. *Id.*

### II. The Alleged Scheme

### A. Pressure at Ambac to Guarantee Riskier Products

The CAC alleges that Ambac employees faced pressure to guarantee increasingly risky kinds of financial products for two principal reasons. First, in 2005, Ambac's CEO Robert J. Genader ("Genader") announced an aggressive net income goal, aiming to reach one billion dollars per year "in the near future." CAC ¶ 67. Ambac's 2004 earnings were $724 million. CAC ¶ 74. Confidential Witness 1 ("CW" 1)[7]

---

**6.** The capital cushion required by the rating agencies is independent of the capital cushion required by regulation, discussed in Part I(c), *supra.*

**7.** The allegations in the CAC are supported in part by information obtained from former employees of Ambac referred to as Confidential Witnesses. CW 1 was an underwriter and quantitative analyst at Ambac between 1997 and 2005.

claims that Genader pushed this income goal but did not increase Ambac's infrastructure or staff size to achieve it, compelling the company to take on high premium, high risk transactions. CAC ¶ 75. Second, Ambac's historic business of insuring municipal bonds had become a diminishing source of growth for the company. A July 2006 report by Moody's noted that Ambac had "taken the muni market about as far as it can go ... When you have penetration like that, it's hard to do more business...." CAC ¶ 39. The CAC also alleges that Ambac's municipal bond business had previously benefited from the rating agencies' undisclosed practice of assigning lower ratings to municipalities and governments in order to force them to purchase bond insurance. CAC ¶ 40. In early 2006, Moody's allegedly informed Ambac that it would no longer assign ratings in this way, curtailing the profitability of Ambac's work in the municipal bond sector. *Id.* In the face of these pressures on Ambac's business, plaintiffs allege that Ambac pursued riskier, more lucrative deals that the company had previously lost to competitors because they did not meet Ambac's (historically) cautious underwriting policies. *See* CAC ¶¶ 78, 81, 84–5.

## B. Underwriting Standards at Ambac

### i. Ambac Allegedly Learned That Mortgage Originators Had Lowered Their Lending Standards

Before the start of the Class Period, the largest mortgage originators in the United States had lowered their lending standards and were selling lower quality mortgages into RMBS-related securities. CAC ¶¶ 12, 55–59. Ambac stated in its financial disclosure that the company's underwriting often "entails on-site due diligence covering the parties to the transaction, such as the issuer, originator, servicer or manager." [8] CAC ¶ 76. According to CW 3,[9] Ambac learned of the lowered standards being employed by mortgage originators at due diligence visits to originators in 2005 and early 2006. CAC ¶ 77. Plaintiffs allege that by the middle of 2006 Ambac knew that originators had materially lowered their lending standards across the board. CAC ¶ 87.

### ii. Ambac Allegedly Reduced Their Underwriting Requirements for RMBS

Ambac allegedly lowered their underwriting requirements in three ways. First, in 2006 Ambac lowered its demands on overcollateralization for guaranteeing securities based on home equity lines of credit ("HELOCs"). Whereas Ambac used to require 3.5% overcollateralization for such deals, in early 2006 Ambac reduced the minimum amount of this structural protection to 0.5%. CAC ¶¶ 80–81. According to CW 3, in June 2006 the First Vice President in Ambac's Consumer Asset–Backed Securities Group wrote a memo to the Credit Risk Committee detailing a "drastic" change in underwriting standards for HELOCs. CAC ¶ 84. The Credit Risk Committee, which included defendants Genader, John W. Uhlein III ("Uhlein") and David W. Wallis ("Wallis"), reviewed the memo and approved the change.[10] *Id.* The CAC alleges that Ambac did not disclose this change, but there is no allegation that Ambac ever publicly reported their precise overcollateralization requirements.

---

**8.** *See, e.g.,* Ambac's Form 10–K for the year ended December 31, 2006.

**9.** CW 3 was an underwriter in Ambac's RMBS group from October 2001 to February 2007.

**10.** The CAC does not specify a date for the committee's approval.

Second, in 2006 Ambac began to insure RMBS backed by "piggyback" loans, which are closed-end second mortgages ("CES" mortgages) that cover the initial down-payment for a home.[11] CAC ¶ 82. Prior to 2006, Ambac had a policy against such deals and would only insure RMBS backed by CES loans if the borrowers had owned their home for some time, had paid back part of their first-lien mortgage, and had some equity in their home. *Id.* Ambac did not disclose this change in policy.

Third, in June 2006, Ambac stopped testing RMBS on a loan-by-loan basis to assess risk and instead applied a new model that looked only at the historical cumulative default rate of the loan originators. CAC ¶¶ 85–86. For example, if a pool of underlying loans was originated by Countrywide, Ambac would run its model against Countrywide's historic default rate, but would not look at the underlying loans in the pool as the basis for projecting future defaults. *Id.* Ambac did not disclose this change in their underwriting procedure.

### iii. Ambac's Underwriting Standards for CDO Transactions Were Allegedly Deficient

The CAC alleges that Ambac approved CDO deals in which the underlying RMBS collateral would not have satisfied the company's internal RMBS underwriting requirements, even after such requirements had been lowered. CAC ¶ 91. In October 2006, defendant Uhlein, an Executive Vice President and a member of the Credit Risk Committee, received a memo from the head of Consumer Asset–Backed Securities that asked: "Why are we willing to insure stuff in the secondary market [i.e. the CDO market] that we would not touch with a ten foot pole in the primary market [i.e. the RMBS market]?" CAC ¶¶ 88–89. CW 3 claims to have seen this memo on a computer screen around the time it was sent. *Id.* According to CW 4,[12] Jeff Nabi, a Managing Director in the Consumer Asset–Backed Securities group, expressed his concerns about Ambac's CDO exposures and complained internally that CDO deals did not face the same scrutiny or stress testing as other transactions. CAC ¶ 90.

Finally, plaintiffs allege various other deficiencies in Ambac's CDO underwriting and surveillance practices. According to CW 2,[13] Ambac's surveillance department was not responsive, often short-staffed, and, because of high turnover in personnel, was "in disarray" in 2006. CAC ¶ 75. According to CW 5,[14] in late 2006 and early 2007 Ambac's CDO team was "churning out deals" and failed to conduct in-depth analysis of the collateral supporting CDOs on at least some deals. CAC ¶ 91. Instead of conducting detailed underwriting, the process evolved to "relying on counterparties" for due diligence, meaning the investment bankers who originated CDOs. *Id.* CW 5 also states that the CDO team relied heavily on ratings published by credit rating agencies in determining whether to review the RMBS collateral supporting a CDO. CAC ¶¶ 92, 103. Ambac's public disclosures stated that its poli-

---

11. A closed-end second mortgage is a loan drawn against the value of a home in excess of any first-lien loan, where the borrower draws the entire amount upon loan issuance and cannot re-borrow after paying down principal. A "piggyback" loan is a CES loan that has been drawn to cover the down-payment requirement of the first-lien loan, thus allowing the borrower to cover the entirety of the home purchase with borrowed funds.

12. CW 4 was a Vice President in Ambac's Consumer Asset–Backed Securities Group from July 2002 to April 2007.

13. CW 2 was an Assistant Vice President in Ambac's financial control group from March 2002 to August 2006.

14. CW 5 was a Vice President at Ambac between January 2005 and July 2007.

cy was not to rely on ratings agencies in approving transactions because the company conducted its own independent analysis of each transaction.[15] CAC ¶ 104.

### C. The Performance of Ambac's RMBS and CDO Portfolios

Plaintiffs make detailed allegations about the deterioration of the RMBS and CDO markets and its impact on Ambac's guarantees of such products. By the start of the Class Period, a negative trend in the market indicated rising delinquencies and default rates in the underlying collateral of RMBS-related instruments. CAC ¶ 105. Moody's and S & P reports described rising mortgage delinquencies and early payment defaults starting in the third quarter of 2006, and the trend worsened as the Class Period continued. CAC ¶ 108. Whereas in mid–2006 the average percentage of underlying mortgages that had been in delinquency for 30–59 days was under 1%, this figure had doubled by the end of 2006 and had tripled by late summer 2007. CAC ¶ 133. By early 2007, media and research analysts had begun to link the decline in the housing market and increase in delinquencies to a weakening of the securitized RMBS and CDO markets. CAC ¶ 111.

Plaintiffs allege that although Ambac mostly guaranteed only the highly-rated tranches of RMBS and CDOs, the erosion of the supposedly secure revenue streams that supported these instruments meant that the risk was increasing that Ambac would actually have to (a) pay out on their obligations and (b) disclose and account for

these losses,[16] impairing its capital cushion and putting pressure on Ambac's AAA credit ratings. CAC ¶ 109.

Plaintiffs illustrate their claims about Ambac's deteriorating CDO portfolio using "expert analysis" from anonymous independent consultants, including mortgage industry specialists and a former trader of RMBS and CDOs. CAC ¶ 114; Oral Argument Tr. 30. Plaintiffs' analysis compares a sample of Ambac's CDS contracts with two market indices, the "ABX" and "TABX" indices, which track the value of CDS written as insurance against dozens of representative RMBS. CAC ¶ 111. The analysis allegedly demonstrates that, throughout the Class Period, Ambac's portfolio performed in line with "and often times worse than" the deteriorating market. CAC ¶ 125. In particular, the analysis concludes that by the first quarter of 2007 there was a "clear deterioration" in the underlying assets of Ambac's HELOC and CES portfolios, which performed "almost identically (*i.e.* just as poorly) as [sic] the ABX and TABX indices." CAC ¶ 130–31.

Plaintiffs' expert analysis seeks to replicate the information that was available to Ambac and its surveillance team, but which was not available to investors because Ambac did not publicly identify the underlying collateral of its insured CDOs, at least until January 30, 2008.[17] CAC ¶¶ 115–16. This information gap was understood by market analysts. For example, on August 23, 2007, a Piper Jaffrey

---

**15.** *See* Ambac Form 8–K, filed December 27, 2007.

**16.** Since the risk of a CDO default would impact the "fair value" of Ambac's CDS contracts, GAAP required Ambac to take appropriate write-downs in its financial disclosure.

**17.** Investors gained access to such information on January 30, 2008, when a third party

posted on its website an "Open Source Model," which listed all of Ambac's RMBS and CDO exposures, including the securities comprising the collateral for Ambac's CDOs. CAC ¶ 116. Prior to that date, Ambac's website disclosed the total size of the company's CDO exposures, but did not name or identify the individual CDO instruments Ambac insured. CAC ¶ 117; Oral Argument Tr. 9–15.

analyst report noted that only Ambac had access to the information needed to accurately asses the quality of its CDO exposures and the adequacy of its underwriting: "Despite any analyst or investor's best attempt, the information flow on a deal by deal basis simply cannot be granular enough to come to any real conclusion about these very protections, let alone knowing whether or not they exist in a specific deal." CAC ¶ 204.

## III. The Allegedly False and Misleading Statements Issued During the Class Period

During the Class Period, plaintiffs allege that Ambac made numerous false statements that fall generally into three categories. The first category of statements are those that portray Ambac's underwriting procedures as continuing to be cautious and conservative, while failing to disclose that the company had lowered its underwriting standards. CAC ¶ 87. In the second category are statements about Ambac's active monitoring of its RMBS and CDO portfolios in conjunction with statements about the strong performance of those portfolios, including statements that describe Ambac as outperforming the market. CAC ¶ 125. The third category covers Ambac's allegedly false financial statements and the company's failure to disclose, in a timely manner, any material impairment to the RMBS-related instruments Ambac insured. CAC ¶ 105.

## A. Statements Regarding Underwriting Standards

Defendants' alleged misstatements during the Class Period include:

- "[W]e're very selective in [the CDO] sector . . . I would also say, as a matter [sic], that our CDO portfolio, when we look at structured credit with MBS, we're also very cautious about mezzanine-type securities that come out of mortgage-backed securitizations. So, we are taking a cautious position for underwriting reasons." Sean T. Leonard, Chief Financial Officer, October 25, 2006, investor conference call; CAC ¶ 92, 148.[18]

- With respect to Ambac's CDO obligations: "Ambac considers the unique attributes of the underlying collateral and transaction." Ambac Form 10–Q for 3Q 2006, filed November 8, 2006; CAC ¶ 153.

- "[Ambac's due diligence] often entails on-site due diligence covering the parties to the transaction, such as the issuer, originator, services or manager." Ambac Form 10–K for the year ended December 31, 2006, filed on March 1, 2007; CAC ¶ 161.

- "The deals we ensure must meet Ambac's strict underwriting standards . . . [W]e have maintained the same conservative standards over the years." Uhlein, March 6, 2007, conference at Association of Independent Financial Advisors; CAC ¶¶ 100, 173.

**18.** The CAC also contains the responses of market analysts during the Class Period, which are based in part on the statements made by Ambac management and may be relevant in that they reflect the information available to sophisticated market observers at particular points in time. For example, on December 14, 2006, a Morgan Stanley analyst wrote: "[W]e highly doubt [Ambac] management would lower its underwriting standards just to post top line growth." CAC ¶ 93. On February 8, 2007, a Citibank report stated that Ambac's "[d]ue diligence has been key to low losses . . . Not only does Ambac review the deal closely, but also is careful only to work with established CDO managers," and that Ambac's CEO, Genader, had "emphasized that the portfolio cannot be measured in average terms because the financial guarantee model is predicated on zero-loss underwriting." CAC ¶ 157.

- Regarding Ambac's "conservative" underwriting: "[O]ur strongest writings were in CDOs of ABS where we have been cautious and selective." Leonard, July 25, 2007, investor conference call following press release; CAC ¶ 193.

- "[Ambac] does not underwrite based solely on the deal's public rating ... We believe our credit-risk analysis goes far beyond that which a typical CDO investor would perform ... [Ambac puts each deal through a] rigorous review process, [including] a rigorous review of the CDO manager ... and a detailed review and re-rating of the underlying RMBS collateral in the deal." Tom Godolfo, Senior Managing Director, July 25, 2007, investor conference call following press release; CAC ¶ 194.[19]

- "First of all, we use our own ratings, and so we rate the transactions. All of them are Triple A. And how we actually dig into them is that we drill down. In the case of some of our transactions we will look at 15,000 individual [data points], we will then project current rates of loss, and future rates. We are very comfortable with that portfolio and our detailed analysis that we update every single month." Genader, November 1, 2007, CNBC Interview; CAC ¶ 217.

- "Ambac does not rely on the agencies in either approving transactions or assigning internal ratings to the deals it approves. We conduct our own independent analysis of each transaction and the transaction is reviewed by one of our respective Senior Credit Committees pursuant to our credit process and policies ... [Ambac's subprime RMBS exposure] has steadily de-creased ... [as] a result of Ambac having been very selective in underwriting new direct RMBS exposure in the last two years." Ambac Form 8–K, filed November 13, 2007; CAC ¶¶ 234–35.

## B. Statements Relating to Performance and Monitoring of Ambac's Portfolio

Defendants' alleged misstatements during the Class Period include:

- "Active surveillance of the insured portfolio enables Ambac's Surveillance Group to track credit migration of insured obligations from period to period and prepare an adversely classified credit listing. The active credit reserve is established only for adversely classified credits. The criteria for an exposure to be included on the adversely classified credit listing includes underperformance of the underlying collateral (for collateral dependent transactions such as mortgage-backed securitizations), problems with the servicer of the underlying collateral and other adverse economic events or trends...." Ambac Form 10–Q for 3Q 2006, filed November 8, 2006; CAC ¶ 151.

- Regarding the surveillance review process: "Those credits that are either in default or have developed problems that eventually may lead to a claim or loss are tracked closely by the appropriate surveillance team and reported to management and Ambac's Board of Directors by preparation of an adversely classified credit listing. Relevant information, along with the plan for corrective actions and a reassessment of the credit's rating and credit

19. Analyst Response: On August 23, 2007, a Piper Jaffrey analyst reported that Ambac engaged in a "highly regimented process for underwriting CDO[s]," noting especially Ambac's "review of the underlying collateral." CAC ¶ 204.

classification, is reviewed with senior management in regular adversely classified credit meetings ... Ambac's exposure to CDOs in its classified portfolio is currently limited." Ambac Form 10–K for the year ended December 31, 2006, filed March 1, 2007; CAC ¶¶ 162–63.

● "[O]ur participation in subprime market [sic] has dropped significantly over the last three years. The deals we have done ... are performing satisfactorily. We get monthly downloads on all of our deals and actively surveil, and monitor the performance of all our mortgage originators." Uhlein, March 6, 2007, conference at Association of Independent Financial Advisors; CAC ¶¶ 100, 173.

● "Rest assured that we will continue to be disciplined and rigorous in our scrutiny of [mortgage-related exposures]" Genader, March 30, 2007, letter to shareholders in Ambac 2006 Annual Report; CAC ¶¶ 94, 176.

● On April 25, 2007: "[We have] very current information—information, pool information up through the end of March, so very current ... [We are] able to analyze that on a very current basis and look for trends of the underlying performance ... We just haven't seen—certainly not significant deterioration ... We're just not seeing deterioration up through March ·that wasn't expected." Leonard, investor

● Regarding how market-wide RMBS weakness could affect Ambac: "We've been pretty conservative and so we are very comfortable with our current book of business, even in this environment. So I think the focus from our perspective is to the extent there is a little turmoil in the market, to be honest, that's actually a good thing for financial guarantors, so we are hoping to participate more in the market going forward." Uhlein, June 12, 2007, Mortgage Finance Conference at Keefe, Bruyette & Woods; CAC ¶¶ 94, 188.

● In response to investor questioning regarding the ABX and TABX indices: "I look at the same indexes that you look at [W]hen we look at our deals, we don't feel we underwrite the market." Godolfo, July 25, 2007, investor conference call following press release; CAC ¶ 195.[21]

● "[T]here clearly is a disconnect between the value of our portfolio, which is in very good shape, versus what has happened in the stock price in the last couple of months ... Our company is very solid and very safe ... [Ambac's] stock price is definitely too low ... Our performance, as Ambac, is very different than the rest of the market." Genader, November 1, 2007, CNBC Interview; CAC ¶ 218.

conference call following press release; CAC ¶ 180.[20]

**20.** Analyst Response: On April 26, 2007, Bank of America maintained its "Buy" rating on Ambac stock, stating that Ambac "is entering a *sweet spot* as signs of further gradual credit spread widening are emerging and exposure to areas of concern—namely subprime and Alt–A—are limited." CAC ¶ 181 (emphasis in original analyst report).

**21.** Analyst response: On July 25, 2007, a Morgan Stanley report stated, "[t]he company's in-depth discussion on the conference call about how it protects itself against CDO

losses ... seemed to go a long way toward alleviating investor concerns." CAC ¶ 197. On July 26, 2007, a Deutsche Bank report stated that **"Ambac is not the market."** *Id.* (emphasis in original analyst report). On October 24, 2007, a Bank of America report entitled "In Our View, It'll Be Worth the Ride," stated that Ambac's "[u]nderwriting discipline is the key to the divergence we expect to see between the performance of Ambac's insured portfolio and the general marketplace." CAC ¶ 215.

- Regarding Ambac's stock price decline in late October and early November of 2007: "[Ambac's stock price] drop in the last few weeks has been caused by a number of misperceptions about the industry in general and misperceptions about Ambac specifically ... I hope to be able to calm the stories and restore the faith in the credit underwriting skills and surveillance and remediation capabilities that this Company has displayed for more than 35 years ... [These misperceptions are, for example, that] Ambac's insured portfolio mirrors the ABX." Genader, November 7, 2007, investor conference call; CAC ¶ 227.

- "In fact, Ambac is not a proxy for the mortgage market: we are not a mortgage guarantor, we did not wrap any of the deals on the ABX index and we have wrapped only a fraction of the hundreds of deals that have been downgraded by S & P, Moody's and Fitch." Ambac Form 8–K, filed November 13, 2007; CAC ¶ 235.

- "Our transactions do not replicate the ABX index. [The ABX index] is not Ambac." Genader, November 28, 2007, Friedman Billings Conference; CAC ¶ 241.

### C. Ambac's Financial Statements

The CAC alleges that Ambac falsely reported its financial position, in violation of GAAP, for the years ended December 31, 2006 and December 31, 2007, and for the quarterly periods ended March 30, 2007, June 30, 2007, and September 30, 2007 by, *inter alia*, overstating assets and net earnings, understating liabilities, failing to disclose negative trends, failing to fairly mark-to-market the value of its CDS on CDOs, and failing to take adequate loss reserves on its direct RMBS exposures. CAC ¶ 259. In particular, plaintiffs assert that GAAP required defendants to disclose material impairment to Ambac's CDO exposures long before the company announced a significant writedown on January 16, 2008. The "expert analysis" performed by plaintiffs' consultants determined that Ambac should have reported net mark-to-market losses on its CDS contracts in the following amounts: (1) $2.1 billion for the quarter ended March 30, 2007, when Ambac in fact announced $5 million; (2) $2.7 billion for the quarter ended June 30, 2007, when Ambac announced $57 million; (3) $8.9 billion for the quarter ended September 30, 2007, when Ambac announced $743 million; and (4) $17 billion for the *year* ended December 31, 2007, when Ambac in fact announced $6.1 billion. CAC ¶¶ 141–45.

Defendants' alleged misstatements during the Class Period in this category include:

- "Ambac's exposure to derivative instruments ... are accounted for at fair value under SFAS 133[ ]." *See, e.g.*, Ambac Form 10–K for the year ended December 31, 2006, filed March 1, 2007; CAC ¶ 160.

- "[O]ur Consolidated Financial Statements ... have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP")." *See, e.g.*, Ambac Form 10–K for the year ended December 31, 2006, filed March 1, 2007; CAC ¶¶ 184, 200, 231, 253.

### IV. Corrective Disclosure

Starting on January 16, 2008, Ambac investors began to learn the full scale of the company's financial distress resulting from RMBS-related exposures. That day, Ambac issued a press release announcing (1) a $5.4 billion mark-to-market loss on its CDO portfolio for the fourth quarter of 2007, (2) a $1.1 billion credit impairment charge,[22] (3) an expected net loss of "up to

---

**22.** Credit impairment charges reflect a reduc- tion in the amount of credit made available to

$32.83" per share for the quarter, and (4) the resignation of Genader as CEO. CAC ¶¶ 245, 315. Ambac attributed the losses primarily to underperforming HELOC and CES RMBS securitizations. CAC ¶ 246. Ambac's stock price fell from $21.14 to $6.24 per share in the two days following the announcement. CAC ¶¶ 316–17. On January 18, 2008, Ambac's credit rating was downgraded by Fitch, making Ambac the first bond insurer to lose its AAA rating. CAC ¶ 319.

On January 30, 2008, a financial research and investment firm posted on its website an "Open Source Model," which listed all of Ambac's RMBS and CDO exposures, including the securities comprising collateral for Ambac's CDOs. CAC ¶ 116; Oral Argument Tr. 10. This information had not previously been available to the public—at least not in a form that was accessible to the average investor—and therefore the Open Source Model allowed investors to determine for the first time whether Ambac's statements about its mortgage collateral were true. CAC ¶ 115; Oral Argument Tr. 10–17.

The remaining facts and disclosure occurred after the Class Period, which ended on April 22, 2008. On April 23, Ambac announced (1) a net loss of $1.66 billion for the first quarter of 2008, (2) a mark-to-market loss of $1.7 billion on CDO exposures, and (3) a credit impairment charge of $1.0 billion attributed to HELOC and CES deals. CAC ¶ 320. Defendant Leonard stated that "on some exposures . . . losses could reach as high possibly as 80%." CAC ¶ 320. That day, Ambac's stock price fell 43% to $3.46. CAC ¶ 322. The stock fell below $1.05 on July 2, 2008 and trading was temporarily halted. CAC

¶ 323. Ambac's stock price had reached a Class Period high of $96.08 on May 18, 2007. *Id.*

Ambac also disclosed the causes of its financial distress. For example, on May 22, 2008, Ambac disclosed that their poorly performing CES deals were "piggyback" transactions, *i.e.* pools of second mortgages that covered the initial down payment on a home. CAC ¶ 322. On June 4, 2008, an Ambac Executive Vice President stated at a financial conference that Ambac's recent CES deals were "essentially where people were leveraging to make 100%—leveraging their down payment on a house." CAC ¶ 322.

Ambac did not receive a "bailout" in the form of direct assistance from the Federal government and the company has not restated any of its financials.

## V. Ambac's Public Offerings During the Class Period

During the Class Period, Ambac completed three public securities offerings. The CAC alleges that the registration statements and prospectuses for these offerings contained misrepresentations or omissions of material fact or incorporated by reference documents that contained misrepresentations or omissions of material fact.

### A. February 2007 "DISCS" Offering

Ambac made a $400 million public offering of Directly–Issued Subordinated Capital Securities ("DISCS") on February 7, 2007.[23] CAC ¶¶ 355–56. This offering was made pursuant to the following documents, filed with the SEC: (1) Ambac's automatic shelf registration statement, on Form S–3,

---

a company by its lenders. Such charges are generally considered a proxy for significant weakening of a company's finances and, unlike mark-to-market losses, are not reversible over time in future financial statements.

**23.** DISCS are unsecured subordinated debt instruments. CAC ¶ 356.

filed February 16, 2006; (2) a post-effective amendment to the Form S–3, filed February 6, 2007; and (3) a prospectus supplement, filed February 7, 2007. The prospectus supplement incorporated by reference the following disclosure documents released during the Class Period: Ambac's Form 10–Q for the third quarter of 2006, filed November 8, 2006, and two Form 8–Ks containing Ambac's press releases from October 25, 2006 and January 31, 2007. The additional plaintiff named in the CAC, Painting Industry Insurance and Annuity Funds, purchased DISCS securities in this offering. CAC ¶ 368.

The prospectus supplement and registration statement for the DISCS offering were signed, pursuant to powers of attorney, by defendants Genader and Leonard, as well as by the Board of Directors, namely defendants Callen, Lassiter, Considine, Gregory, Theobald, Unger, and Wallace. CAC ¶¶ 371–79. The underwriters for the DISCS offering were defendants Citigroup, Goldman Sachs, J.P. Morgan, HSBC, Merrill Lynch, UBS and Wachovia. CAC ¶¶ 381–88.

The CAC alleges that certain statements in the DISCS offering documents, or incorporated into the offering documents by reference, were misleading because (1) "[i]n 2006 mortgage originators lowered their underwriting standards for mortgages comprising Ambac's direct and derivative RMBS exposures," (2) "Ambac had lowered its own underwriting standards for RMBS and CDOs backed by RMBS," and (3) "[t]he collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics." CAC ¶¶ 400, 405, 408. The allegedly misleading statements identified in the CAC are:

- "We are currently witnessing a solid level of deal inquiries and opportunities ... We remain steadfast in judi-

ciously allocating our capital to transactions that enable us to continue to deliver superior returns. Form 8–K, filed October 25, 2006; CAC ¶ 399.

- Active surveillance of the insured portfolio enables Ambac's Surveillance Group to track credit migration of insured obligations from period to period and prepare an adversely classified credit listing. The active credit reserve is established only for adversely classified credits. The criteria for an exposure to be included on the adversely classified credit listing includes underperformance of the underlying collateral (for collateral dependent transactions such as mortgage-backed securitizations), problems with the servicer of the underlying collateral and other adverse economic events or trends ..." Form 10–Q for the quarter ended September 30, 2006, filed November 8, 2006; CAC ¶ 402.

- Arabac takes active credit reserves based on, *inter alia*, Ambac's information regarding "historical default information [and] internally developed loss severities." Form 10–Q for the quarter ended September 30, 2006, filed November 8, 2006; CAC ¶¶ 403–04.

- "[W]e note that the mortgage-backed and home equity ultimate [loss] severities have been better than or equal to our current severity assumption." *Id.*

- With respect to CDO obligations, "Ambac considers the unique attributes of the underlying collateral and transaction." *Id.*

Although not listed in the CAC, we also note the following statements from the DISCS offering documents or incorporated by reference therein:

- "Underwriting guidelines, policies and procedures have been developed by Ambac Assurance's management with the intent that Ambac Assurance guar-

antees only those obligations which, in the opinion of Ambac Assurance underwriting officers, are of investment grade quality with a remote risk of loss ... The underwriting process involves review of structural, legal, political and credit issues, including compliance with current Ambac Assurance underwriting standards. These standards are reviewed periodically by management." Form 10–K for the year ended December 31, 2005, filed on March 13, 2006, at 10; *see* Decl. of Lee C. Wilson, Ex. 31.

- Among a number of "Risk Factors" about the DISCS offering: *"Our risk management policies and practices may not anticipate unforeseen risks and/or the magnitude of potential for loss as the result of foreseen risks.* As described in "Business–Risk Management" on page 10 of our Annual Report on Form 10–K for the fiscal year ended December 31, 2005, which is incorporated by reference in this prospectus supplement, we have established underwriting policies and practices which seek to mitigate our exposure to credit risk in our insured portfolio. These policies and practices are based in part on models reflecting historical factors, e.g. default rates and severity of loss experience. These policies and practices may not insulate us from risks that are unforeseen and which have unanticipated loss severity." Prospectus Supplement for DISCS Offering, filed February 7, 2007, at S–10 (emphasis in original); *see* Wilson Decl., Ex. 60.

## B. The March 2008 Offerings

On March 6, 2008, Ambac made a public offering of 5 million equity units (the "Equity Units Offering") and, on the same day, a public offering of over 170 million shares of common stock (the "Common Stock Offering"). CAC ¶¶ 359, 362.

These offerings were made pursuant to the following documents, filed with the SEC: (1) Ambac's automatic shelf registration statement, on Form S–3, dated February 16, 2006, (2) a post-effective amendment to the Form S–3, dated January 16, 2008, and (3) two prospectus supplements, one for each offering, both dated March 6, 2008. Each of the prospectus supplements incorporated by reference the following disclosure documents released during the Class Period: Form 10–Ks for the years ended December 31, 2006 and December 31, 2007; Form 10–Qs for the first, second and third quarters of 2007; Form 8–Ks containing press releases from January 31, 2007, April 25, 2007, July 25, 2007, October 24, 2007, January 16, 2008, and January 22, 2008. Two of the institutional investors named as Lead Plaintiffs, the Arkansas Teachers' Retirement System and the Public Employees' Retirement System of Mississippi, purchased Ambac common stock in the Common Stock Offering. CAC ¶¶ 366–67. No named plaintiff purchased securities in the Equity Units Offering.

The prospectus supplements and registration statements for the March 2008 offerings were signed, pursuant to powers of attorney, by defendants Callen and Leonard, as well as by the Board of Directors, namely defendants Considine, Theobald, Unger, Wallace, and Duff. CAC ¶¶ 371–80. The underwriters for the March 2008 offerings were defendants Citigroup, UBS, Credit Suisse, Banc of America, and Keefe, Bruyette & Wood. CAC ¶¶ 381–91. The opinions of Ambac's outside auditor, defendant KPMG, were incorporated by reference into the prospectuses and registration statements for the March 2008 offerings. CAC ¶ 392.

The CAC alleges that certain statements in the March 2008 offering documents, or incorporated into the offering documents

by reference, were misleading. Misstatements in Ambac's SEC filings during the Class Period, excerpted in Part III, were incorporated into the March 2008 offering documents.

The prospectus supplements for the March 2008 offerings also contained extensive disclosure of "Risk Factors" related to Ambac and its financial condition. This disclosure included:

- *As a result of market conditions, rating agency actions and investor concern with respect to our financial position, our ability to write new business has been severely limited since November 2007, and we have written virtually no new business thus far in 2008.*
- *The placement of our financial strength rating on negative credit watch by S & P and on review for possible downgrade by Moody's and the downgrade by Fitch has had a material adverse effect on our competitive position and our ability to write new business.*
- *Various third-party market participants, including several underwriters in this offering and in the concurrent Equity Units Offering, have made estimates of our losses, estimates of credit impairments and mark-to-market losses that in some cases materially exceed the amounts we have reported.*
- *We are subject to credit risk and other risks related to BMBS and CDOs of ABS.* We have insured, and written credit default swaps ("CDS"), with respect to, RMBS (including transactions composed of second lien mortgage products, Home Equity Line of Credit ("HELOCs") and closed end second mortgage loans) and CDOs of ABS and are thus exposed to credit risk associated with those asset classes . . . While further deterioration in performance of the subprime mortgage sector is generally expected, the extent and duration of any future continued deterioration of the credit markets is unknown, as is the impact, if any, on potential claim payments and ultimate losses of the securities within Ambac Assurance's portfolio.

- *Our underwriting and risk management policies and practices in the past have not anticipated unforeseen risks and/or the magnitude of potential for loss as the result of foreseen risks.*

*See* Ambac Prospectus Supplement, filed March 7, 2008 pursuant to SEC Rule 424(b)(5), for the Equity Units Offering, S–29 to S–41 (emphasis in original); Ambac Prospectus Supplement, filed March 7, 2008 pursuant to SEC Rule 424(b)(5), for the Common Stock Offering, S–7 to S–22 (emphasis in original).

## PROCEDURAL BACKGROUND

Before the Court are defendants' motions to dismiss the CAC made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. On August 27, 2009, motions to dismiss and memoranda of law were filed on behalf of Ambac and the Individual Defendants ("Ambac Mem."), the Underwriter Defendants ("Underwriters Mem."), and KPMG ("KPMG Mem."). The Court heard oral argument on the pending motions on December 17, 2008 ("Oral Argument").

## PLEADING STANDARDS

### I. Motion to Dismiss

On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in plaintiffs' favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d

Cir.2007); *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir.1998). Nonetheless, "[f]actual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citation omitted). Ultimately, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955. If plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955. This pleading standard applies in "all civil actions." *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868 (2009) (quotation omitted).

## II. Exchange Act Claims

Claims of securities fraud brought under Section 10(b) and Rule 10b–5 of the Exchange Act are "subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns*, 493 F.3d at 99. The heightened pleading requirements are set forth in Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u–4(b).

### A. Rule 9(b)

■ While the rules of pleading in federal court usually require only "a short and plain statement" of the plaintiff's claim for relief, Fed.R.Civ.P. 8, averments of fraud must be "state[d] with particularity," Fed.R.Civ.P. 9(b).[24] *See ATSI Commc'ns*, 493 F.3d at 99. In order to satisfy Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3)

state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir.2004) (internal quotation marks and citation omitted). Furthermore, "[a]llegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99.

### B. PSLRA

In the context of securities fraud allegations, the PSLRA has expanded on Rule 9(b)'s pleading requirements. *See* 15 U.S.C. § 78u–4(b). "The statute insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (quoting 15 U.S.C. § 78u–4(b)(1), (2)). "Therefore, '[w]hile we normally draw reasonable inferences in the non-movant's favor on a motion to dismiss,' the PSLRA 'establishes a more stringent rule for inferences involving scienter' because the PSLRA requires particular allegations giving rise to a strong inference of scienter." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir.2009) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir.2008) (alteration in original)).

### III. Securities Act Claims

■ Claims brought under Sections 11 and 12(a)(2) of the Securities Act are gen-

---

**24.** Fed.R.Civ.P. 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

erally subject to the ordinary federal pleading rules of Fed.R.Civ.P. 8. Such claims are not automatically subject to heightened pleading requirements because fraud is not an element or a requisite to a claim under § 11 or § 12(a)(2). *Rombach,* 355 F.3d at 171. However, the heightened pleading standard of Rule 9(b) applies to Securities Act claims insofar as the claims *are* premised on allegations of fraud. *Id.* Courts are required to perform "a case-by-case analysis of particular pleadings to determine whether the gravamen of the complaint is plainly fraud." *In re Refco, Inc. Sec. Litig.,* 503 F.Supp.2d 611, 632 (S.D.N.Y.2007) (internal citation and quotation omitted).

■ When plaintiffs bring claims under both the Exchange Act and the Securities Act, "the same course of conduct that would support a Rule 10b–5 claim may as well support a Section 11 claim or a claim under Section 12(a)(2)." *Rombach,* 355 F.3d at 171. Thus, even when "it is clear that plaintiffs believe [the defendants] were engaged in a massive fraud[,][t]his fact . . . does not take away plaintiffs' right to plead in the alternative that defendants violated provisions requiring only negligence." *In re Refco,* 503 F.Supp.2d at 632. However, plaintiffs' Securities Act claims "cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness." *In re JP Morgan Chase Sec. Litig.,* 363 F.Supp.2d 595, 635 (S.D.N.Y.2005). Rather, plaintiffs should "specifically [plead] alternate theories of fraud and negligence" in order to avoid heightened pleading standards for their Securities Act claims. *In re Refco,* 503 F.Supp.2d at 633.

**DISCUSSION**

Plaintiffs assert claims under seven separate counts. Counts I and II allege fraud and are brought under Sections 10(b) and 20(a) of the Exchange Act against Ambac and certain Individual Defendants. Counts III to VII allege strict liability for material misstatements in connection with Ambac's public securities offerings in February 2007 and March 2008, and are brought under Sections 11, 12, and 15 of the Securities Act against Ambac, certain Individual Defendants, the Underwriter Defendants, and KPMG.

## I. Claims under the Exchange Act

### A. Section 10(b) Claim (Count I)

"Section 10(b) of the Exchange Act is designed to protect investors by serving as a 'catchall provision' which creates a cause of action for manipulative practices by defendants acting in bad faith." *In re Openwave Sys. Sec. Litig.,* 528 F.Supp.2d 236, 249 (S.D.N.Y.2007) (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 206, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). The Securities and Exchange Commission ("SEC") implemented Section 10(b) of the Exchange Act by promulgating Rule 10b–5, 17 C.F.R. § 240.10b–5. In relevant part, Rule 10b–5 provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5.

■ In order to sustain a private cause of action for securities fraud under section 10(b) and Rule 10b–5,[25] plaintiffs must adequately plead: (1) a material misrepresentation or omission by the defendant; (2)

---

**25.** Although the text of the Exchange Act does not explicitly provide for a private cause of action for section 10(b) violations, "[i]t is now established that a private right of action is implied under § 10(b)." *Superintendent of Ins. v. Bankers Life and Cas. Co.,* 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Heller v. Goldin Restructuring Fund, L.P.,* 590 F.Supp.2d 603, 613 (S.D.N.Y. 2008). In this case, defendants argue that plaintiffs have failed to sufficiently plead three of the necessary elements: scienter, materiality, and loss causation. For the reasons discussed below, we reject defendants' arguments and find that plaintiffs have stated a claim under section 10(b).

### i. Scienter

Under the PSLRA, in order to plead scienter adequately and state a claim under section 10(b) and Rule 10b–5, it is necessary to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "The requisite state of mind in a Rule 10b–5 action is 'an intent to deceive, manipulate or defraud.'" *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 168 (2d Cir.2000) (quoting *Ernst & Ernst,* 425 U.S. at 193 n. 12, 96 S.Ct. 1375).

█ Second Circuit case law provides that "[t]he requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994).[26]

The Supreme Court, in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* has inter-

preted the PSLRA's "strong inference" requirement, and has held that, "[a] complaint will survive … only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." 551 U.S. 308, 324, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). In conducting this analysis, a court must be careful to consider whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323, 127 S.Ct. 2499 (emphasis in original). The Supreme Court further noted that "[t]he inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'moking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 424, 127 S.Ct. 2499 (internal citation omitted).

In analyzing whether plaintiffs have pleaded the requisite "strong" inference of scienter, the Court will utilize the Second Circuit's overarching framework of "motive and opportunity" and "conscious misbehavior or recklessness." As at least one court in this District has recognized, the analyses under *Tellabs* and under the Second Circuit's case law "are very much interrelated," such that "the determination of whether [p]laintiff[s] [have] pleaded the proper 'strong' inference of scienter under Second Circuit case law serves as a significant, if not determinative, factor in assessing whether [p]laintiff[s] [have] pleaded the proper 'strong' inference of scienter under *Tellabs*." *In re PXRE Group, Sec. Litig.,* 600 F.Supp.2d 510, 529 & n. 21 (S.D.N.Y.2009), *aff'd sub nom. Condra v.*

---

**26.** Though this standard predates the passage of the PSLRA, the Second Circuit explicitly noted that "both options for demonstrating scienter, either with motive and opportunity allegations or with allegations constituting strong circumstantial evidence of conscious

misbehavior or recklessness, survive the PSLRA." *Kalnit v. Eichler,* 264 F.3d 131, 138–39 (2d Cir.2001); *see also, e.g., Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290–91 (2d Cir. 2006) (quoting *Shields,* 25 F.3d at 1128).

*PXRE Group Ltd.*, 357 Fed.Appx. 393 (2d Cir.2009).

■ Plaintiffs here must plead scienter with respect to each defendant named in plaintiffs' 10(b) claim, *i.e.*, defendants Genader, Leonard, Uhlein, Wallis, as well as the corporate defendant Ambac (collectively, the "Exchange Act Defendants"). When a defendant is a corporate entity, courts look to whether the pleaded facts "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir.2008), *remanded to* No. 05 Civ. 1897, slip op., 2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ("*Dynex II*"). Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority. *See, e.g., Dynex II*, No. 05 Civ. 1897, slip op. at 11. In this case, the officers whose intent could be imputed to Ambac on the pleaded facts are the defendants Genader, Leonard, Uhlein and Wallis (collectively, the "Exchange Act Officers"). We thus focus our analysis on the alleged fraudulent intent of the Exchange Act Officers, whose intent we impute to Ambac.

### 1. Motive and Opportunity

It is not disputed that the Exchange Act Officers had an "opportunity" to commit fraud. *See, e.g., Pension Comm. Of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F.Supp.2d 163, 181 (S.D.N.Y.2006) ("Regarding the 'opportunity' prong, courts often assume that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired."); *see also In re GlaxoSmithkline PLC*, No. 05 Civ. 3751, 2006 WL 2871968, at *6 (S.D.N.Y. October 6, 2006) ("Where a plaintiff alleges securities fraud against a public company and its officers and directors, it is motive

rather than opportunity that is at issue."). Therefore, the issue before the Court on this prong of the analysis is whether plaintiffs have adequately pleaded "motive."

Plaintiffs argue that the Exchange Act Officers were motivated to commit fraud by their desire to (1) maintain Ambac's AAA credit rating, upon which Ambac's entire business model allegedly depended, (2) reach a particular target for the company's net income, (3) increase their compensation packages, much of which was paid in the form of Ambac stock or stock options, and (4) keep their jobs. *See* CAC ¶¶ 67–68, 74, 78, 109; Lead Plaintiffs' Omnibus Opposition to Defendants' Motion to Dismiss ("Pls. Opp'n Mem.") 45–46. Specifically, the CAC alleges that Ambac's officers had an incentive to guarantee increasingly risky financial products in order to generate short-term profits for the company and to achieve the aggressive net income target set by the company's CEO, Genader. CAC ¶ 67. Ambac's business model was premised on its AAA credit rating, which was the basis of the security Ambac provided as a financial guarantor. Thus, when guaranteeing these riskier products began to threaten Ambac's financial health—and in particular the company's credit rating—the Exchange Act Officers were motivated to maintain this rating by concealing the losses and thereby inflating Ambac's stock price. CAC ¶ 109. The CAC alleges that the Exchange Act Officers were motivated to increase their stock-based compensation and protect their jobs from the fallout of Ambac disclosing its true financial position. Pls. Opp'n Mem. 46. Plaintiffs note that when Ambac eventually did disclose material losses on its CDO portfolio, on January 16, 2008, defendant Genader lost his position as CEO. CAC ¶ 245.

■ In the Second Circuit, "[s]ufficient motive allegations 'entail concrete benefits that could be realized by one or more of

the false statements and wrongful nondisclosures alleged.'" *Kalnit*, 264 F.3d at 139 (quoting *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir.2000)). However, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit*, 264 F.3d at 139.

■ Plaintiffs here have failed to plead motive adequately. Each of the motivations alleged in the CAC would be "generally possessed by most corporate directors and officers." *Kalnit*, 264 F.3d at 139. The desire of Ambac officers to increase company profits, keep their jobs, and increase compensation, are classic examples of motives that fail under the Second Circuit analysis as too general. *See Chill v. General Elec. Co.*, 101 F.3d 263, 268 (2d Cir.1996) (motive to "maintain the appearance of corporate profitability" held insufficient); *Shields v. Citytrust*, 25 F.3d at 1130 (desire to keep corporate office not sufficient); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir.1995) (motive to inflate stock price to increase compensation not sufficient). Similarly, the desire to maintain a high corporate credit rating is not enough to plead motive, even though Ambac's credit rating was fundamental to its business model. *See In re PXRE*, 600 F.Supp.2d at 531–32 (finding "too generalized a motive to plead securities fraud"

"the desire to maintain a high credit rating to raise money that is 'desperately needed' or necessary 'to protect the very survival' of a company").

Plaintiffs have therefore failed to plead scienter under the "motive and opportunity" prong.

### 2. Conscious Misbehavior or Recklessness

As noted above, even when motive is lacking, plaintiffs may establish a "strong" inference of scienter, under Second Circuit case law, by "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." [27] *Lerner*, 459 F.3d at 290–91 (internal quotation marks and citations omitted). Plaintiffs allege no facts to support an inference that defendants engaged in "conscious misbehavior." [28] Accordingly, the issue before the Court is whether plaintiffs have adequately pleaded "recklessness."

■ To support a strong inference of recklessness, plaintiffs allege that the Exchange Act Officers (a) knew about Ambac's lowered underwriting standards—and affirmatively approved them—while publicly touting the company's "cautious" and "conservative" approach to underwriting, and (b) learned of the deterioration of Ambac's RMBS and CDO portfolios, while making public statements that Ambac was outperforming the market and would suffer only minimal losses. [29] For the reasons

**27.** We note that if a plaintiff fails to allege adequate motive, as in this case, the strength of the circumstantial allegations of conscious misbehavior or recklessness must be correspondingly greater. *See Kalnit*, 264 F.3d at 142; *see also Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987) ("Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." (internal citations omitted)), *abrogated on other*

grounds by *United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989).

**28.** Conscious misbehavior "encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount." *Novak*, 216 F.3d at 308 (internal citations omitted).

**29.** As an alternative basis for pleading recklessness, plaintiffs allege that the Exchange Act Officers failed to monitor the performance of Ambac's insured portfolio, while under a

below, we find that plaintiffs' allegations of recklessness support a strong inference of scienter for each of the Exchange Act Defendants.

■ In securities cases, the Second Circuit has defined recklessness as "at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care … to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Novak*, 216 F.3d at 308 (quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir.1978) (ellipsis in original)). More specifically, "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak*, 216 F.3d at 308. Sufficient allegations of recklessness therefore require pleading "that specific contradictory information was available to the defendants at the same time they made their

statements." *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F.Supp.2d 452, 484 (S.D.N.Y.2006). The Second Circuit clarified in the *Teamsters* case that "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Teamsters v. Dynex*, 531 F.3d at 196–97. On remand from the *Teamsters* case, the District Court found that the plaintiffs' amended complaint had sufficiently alleged reports containing facts contrary to defendants' statements, noting that the defendants could have been made aware of the falsity of their statements by a number of reports, taken "collectively," and that the plaintiffs were not required to plead that contradictory facts were summarized in a single report.[30] *Dynex II*, No. 05 Civ. 1897, slip op. at 14.

■ The CAC adequately alleges reckless conduct for each of the Exchange Act Officers (Genader, Leonard, Uhlein and Wallis). First, plaintiffs make detailed allegations that Ambac lowered its underwriting standards in several ways, and that such changes were known to Ambac's officers. For example, according to CW 3,[31]

duty to do so and while repeatedly touting the company's close monitoring of the portfolio.

**30.** In addition to their briefs on the motions here, the parties have submitted letters that discuss in detail the applicable standard for pleading scienter following *Teamsters, Dynex II* and more recent precedents.

**31.** Plaintiffs may rely on confidential sources to satisfy the pleading requirements of the PSLRA and Rule 9(b). *See Novak*, 216 F.3d at 314. In such a situation, the confidential sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* Plaintiffs here have met this burden for each of the confidential witnesses mentioned in the CAC. We note that,

following the *Tellabs* decision, the Seventh Circuit has held that allegations from confidential witnesses must be discounted, because "[i]t is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir.2007). The Second Circuit has not yet addressed the issue under the *Tellabs* standard, and, absent its guidance to the contrary, its precedent allowing the use of confidential sources to demonstrate scienter will be followed here. Other courts in this District have proceeded similarly. *See, e.g., In re PXRE*, 600 F.Supp.2d at 526 n. 18; *In re NovaGold Resources Inc. Sec. Litig.*, 629 F.Supp.2d 272, 298 n. 14 (S.D.N.Y.2009).

in early 2006 Ambac lowered overcollateralization requirements for HELOC deals from 3.5% to 0.5%. CAC ¶¶ 80–81. A memo detailing this change was sent to the Credit Risk Committee, which included defendants Genader, Uhlein, and Wallis, and the committee expressly approved the change. CAC ¶ 84. The CAC further alleges that Ambac (1) began to insure RMBS backed by CES mortgages that were "piggyback" loans (*i.e.*, loans to cover the initial down payment on a home), (2) discontinued its practice of testing the underlying collateral of RMBS on a loan-by-loan basis, and (3) failed to re-rate the collateral underlying CDOs, instead relying on counterparties and credit rating agencies. CAC ¶¶ 82, 85–86, 91–92, 103. In October 2006, defendant Uhlein allegedly received an email from the head of Consumer Asset–Backed Securities which asked: "Why are we willing to insure stuff in the secondary market [i.e. the CDO market] that we would not touch with a ten foot pole in the primary market [i.e. the RMBS market]?" CAC ¶¶ 88–89.

These allegations, taking collectively, are sufficient to establish scienter for defendants Genader, Uhlein, and Wallis. The alleged "ten foot pole" email was sent by the head of the group responsible for the underwriting of RMBS to defendant Uhlein, who stated a few months later that Ambac had "maintained the same conservative standards over the years." CAC ¶¶ 100, 173. Uhlein, Genader, and Wallis all served on the Credit Risk Committee which allegedly approved the lowered underwriting standards for HELOC deals, while Uhlein publicly stated that Ambac "maintained the same conservative standards over the years" and other senior officers characterized Ambac's approach to underwriting in the RMBS sector as "rigorous," "very cautious," and "very selective." CAC ¶¶ 148, 173, 192, 194, 234. With respect to defendant Leonard, Ambac's CFO, it strains credulity that he

could remain ignorant of the company's lowered underwriting standards while the CEO and other senior managers were aware of them. Leonard signed Ambac's Form 10–Ks, Form 10–Qs and certain of its Form 8–Ks during the Class Period and played an active role in assuring investors of Ambac's continued commitment to conservative underwriting. CAC ¶¶ 22, 148, 180, 193. However, we need not rely upon such suppositions to find a strong inference of scienter with respect to defendant Leonard, since plaintiffs sufficiently plead Leonard's awareness of facts contradicting his statements about the performance of Ambac's CDO portfolio—the subject to which we now turn.

The CAC alleges that Ambac officers knew about significant deterioration of the company's CDO portfolio while publicly stating, for example, that Ambac is "very solid and very safe," Ambac's "stock price is definitely too low" and Ambac's performance "is very different than the rest of the market." CAC ¶ 218. The Exchange Act Officers' own statements detail the regular reports by which they would have learned of the allegedly drastic deterioration of their CDO portfolio. For example, on April 25, 2007, defendant Leonard stated: "[We have] very current information—information, pool information up through the end of March, so very current . . . [We are] able to analyze that on a very current basis and look for trends of the underlying performance . . . We just haven't seen-certainly not significant deterioration . . . We're just not seeing deterioration up through March that wasn't expected." CAC ¶ 180.

These allegations support a strong inference of scienter with respect to defendant Leonard. As the CAC alleges repeatedly, "[e]ither Ambac conducted the surveillance it claimed, and the Exchange Act Defendants knew of these negative trends but

did not disclose them, or Ambac misrepresented its surveillance process." CAC ¶¶ 198, 205, 216, 219, 237. In either scenario, Leonard's public statements about Ambac's surveillance of "very current" information, when combined with plaintiffs' detailed allegations about the deterioration in Ambac's CDO portfolio, supports the inference that Leonard acted recklessly. CAC ¶ 180. Furthermore, plaintiffs have satisfied the *Teamsters* standard by identifying reports through which Leonard was made aware of facts that allegedly contradict his public statements. *See* 531 F.3d at 196. Ambac's 2006 Form 10–K describes the preparation of an "adversely classified credit listing" that is "reported to management and Ambac's Board of Directors" and "reviewed with senior management in regular adversely classified credit meetings." CAC ¶ 98. In March 2007, defendant Uhlein stated: "We get monthly downloads on all of our deals and actively surveil, and monitor the performance of all our mortgage originators." CAC ¶¶ 100, 173. Since these documents are identified in the defendants' own words, we do not require plaintiffs to provide additional detail about where defendants learned of facts contradicting their statements. In *Teamsters*, the Second Circuit was concerned that the plaintiffs' "broad reference to raw data lacks even an allegation that these data had been collected into reports." 531 F.3d at 196. In this case, by contrast, the Exchange Act Officers themselves described the means by which raw data was collated and analyzed, as part of the surveillance process, and how this formed the basis for defendants' statements about the performance of Ambac's insured portfolio.

For the reasons above, we find that plaintiffs have pleaded facts establishing recklessness for each of the Exchange Act Officers and, accordingly, for the corporate defendant Ambac.

### 3. Existence of a More Compelling Inference

We also find that a reasonable person would deem plaintiffs' inference of scienter "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499. Defendants argue in their submissions that Ambac's financial woes were caused by the global economic collapse and that this is a "fraud by hindsight" case. *See* Ambac Mem. 28; Reply Memorandum in Further Support of Ambac and Individual Defendants' Motion to Dismiss ("Ambac Reply Mem.") 9. In light of the broader financial picture, defendants assert, the more compelling inference is that Ambac's officers could not predict the economic collapse and consequently the company's modeling tools failed to value accurately the risk of loss underlying its CDO portfolio. *Id.*

The defendants' characterization of events is certainly one inference that can be drawn from the alleged facts. It may be that rather than knowingly or recklessly misrepresenting Ambac's underwriting standards and portfolio performance, the defendants were merely negligent in issuing the challenged statements. It is possible that defendants, faced with an unprecedented and uncertain situation, lacked the internal mechanisms to calculate accurately the scale of losses in their CDO portfolio.

However, taking the facts in the light most favorable to the plaintiffs, this does not amount to a more compelling inference than that proffered by plaintiffs based on the facts alleged. Viewing the allegations collectively, there is a vast gap between the picture that Ambac presented to investors—of an insurance company that maintained its conservative approach over the years—and the alleged practices within the company, namely the undisclosed low-

ering of underwriting standards to drive short-term profits. Additionally, defendants' arguments on this issue are premised on a convenient confusion of cause and effect. The conduct that plaintiffs allege, if true, would make Ambac an active participant in the collapse of their own business, and of the financial markets in general, rather than merely a passive victim.

We accordingly find that plaintiffs' purported inference of scienter is sufficiently "strong" for purposes of the PSLRA, because it is "as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 324, 127 S.Ct. 2499.

### ii. Material Misstatement or Omission

Defendants argue that plaintiffs have failed to plead material misstatements or omissions of fact with sufficient particularity. The PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)(B); *see Tellabs,* 551 U.S. at 320, 127 S.Ct. 2499 (2007). To satisfy the materiality requirement, plaintiffs must allege a statement or omission that a reasonable investor would have considered significant in making investment decisions. *See Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (adopting the standard in *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), for § 10(b) and Rule 10b–5 actions); *see also ECA v. JP Morgan,* 553 F.3d at 197. Similarly, an omission is material if there is a substantial likelihood that the "disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the infor-

mation made available." *TSC Indus.,* 426 U.S. at 449, 96 S.Ct. 2126; *ECA v. JP Morgan,* 553 F.3d at 197. Materiality is a mixed question of law and fact. *See TSC Indus.,* 426 U.S. at 450, 96 S.Ct. 2126. When presented with a Rule 12(b)(6) motion, "a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir. 1985); *see In re Morgan Stanley Information Fund Sec. Litig.,* 592 F.3d 347, 360 (2d Cir.2010).

We find that plaintiffs have sufficiently alleged that defendants made misleading statements and omissions. The CAC alleges that defendants (1) failed to disclose the lowering of Ambac's underwriting standards, (2) misrepresented the performance of Ambac's CDO portfolio, and (3) misstated Ambac's financial information in violation of GAAP. With respect to the first category of statements, plaintiffs identify several changes in Ambac's underwriting practices that loosened requirements for guaranteeing RMBS and RMBS-related instruments. In light of defendants' touting of the company's "conservative" and "very cautious" underwriting standards that remained "the same ... over the years," the failure to disclose the lowering of such standards is actionable under § 10(b). CAC ¶¶ 148, 173, 192–194, 234.

Other courts have recognized that the underwriting practices of mortgage lenders and insurance companies are highly material to investors. *See, e.g., Atlas v. Accredited Home Lenders Holding Co.,* 556 F.Supp.2d 1142, 1155 (S.D.Cal.2008) ("[A]s a mortgage lender ... underwriting practices would be among the most impor-

tant information looked to by investors."); *In re PMA Capital Corp. Sec. Litig.*, No. 03–6121, 2005 WL 1806503, at *10 (E.D.Pa. July 27, 2005) (misrepresentations regarding insurance company's underwriting practices are actionable). The underwriting standards of a financial guarantor such as Ambac would be equally critical to investors, since the company's success necessarily relies on Ambac's ability to analyze the collateral of financial products and assess the risk of default. Indeed, the materiality of omitting from disclosure the changes in Ambac's underwriting standards is evident from the emphasis of Ambac officers on the importance of conservative underwriting. As articulated by the Third Circuit eighteen years ago,

> [W]here a defendant affirmatively characterizes management practices as "adequate," "conservative," "cautious," and the like, the subject is "in play." For example, if a defendant represents that its lending practices are "conservative" and that its collateralization is "adequate," the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations ... By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.

*Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir.1992), *cert. denied*, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). In the present case, given that Ambac's officers characterized the company's underwriting standards as "rigorous" and "conservative," the failure to disclose a lowering of such standards was a material omission.[32]

■ Plaintiffs have also alleged actionable misstatements with respect to the performance of Ambac's CDO portfolio. Using plaintiffs' "expert analysis,"[33] the CAC alleges that during the Class Period Ambac's portfolio of CDO exposures performed in line with—and "oftentimes worse than"—the deteriorating market reflected in the "ABX" and "TABX" indices. CAC ¶¶ 111–33. If correct, the results of the expert analysis would specifically contradict defendants' statements that Ambac does not "underwrite the market" and Ambac's performance "is very different than the rest of the market." CAC ¶¶ 195, 218. Defendants argue that plaintiffs' expert analysis is flawed because the ABX and TABX indices should not be used as valuation tools and because the analysis fails to take account of the fact that Ambac only wrote CDS for CDOs that contained highly-rated senior and "super-senior" tranches of RMBS. Ambac Mem. 13, 15–18. Defendants contend that Ambac benefited from subordination and other deal protections that left the company's insured port-

---

**32.** The CAC also alleges facts about Ambac's underwriting practices that directly contradict the affirmative statements of Ambac's public filings. For example, plaintiffs allege that Ambac officers were relying on counterparties and rating agencies in the underwriting process, and were failing to re-rate the collateral underlying the CDOs Ambac guaranteed. CAC ¶¶ 91–92, 103. These facts, which the Court must take as true for purposes of analyzing the present motions, render false the statements in Ambac's filings that the company did not rely on counterparties and always re-rated the underlying collat-

eral of CDOs as part of the underwriting process. Form 8–K, filed December 27, 2007; CAC ¶ 104. Such statements therefore satisfy the standard for "materially misleading" at this stage.

**33.** As noted above, plaintiffs illustrate their claims about Ambac's deteriorating CDO portfolio using "expert analysis" from anonymous independent consultants, including mortgage industry specialists and a former trader of RMBS and CDOs. CAC ¶ 114; Oral Argument Tr. 30.

folio far better off than the ABX or TABX indices. *Id.*

We find defendants' arguments unavailing for three reasons. First, plaintiffs assert that their expert analysis factored in conservative adjustments for the deal protections Ambac employed. *See* CAC ¶¶ 111–33; Pls. Opp'n Mem. 27. To evaluate whether or not the experts' adjustments are adequate would require the Court to delve into complex factual disputes that cannot be resolved on a motion to dismiss. Second, defendants' claim that they did not "wrap" any of the products on the ABX or TABX indices is not responsive to plaintiffs' allegations that the performance of the underlying assets in Ambac's CDO portfolio did in fact perform in line with those indices. Third, the defendants' own statements refer to the ABX index as a comparative tool for valuing Ambac's CDO portfolio. For example, defendant Genader stated that Ambac's insured portfolio does not "mirror" or "replicate" the ABX, and that the ABX "is not Ambac." CAC ¶¶ 227, 241. The CAC, however, alleges facts showing that the performance of Ambac's CDO portfolio mirrored the ABX at the same time that defendants told investors it did not. Thus, even if the ABX is a flawed valuation tool

or a poor comparative for Ambac's portfolio, plaintiffs have successfully pleaded material misstatements.[34]

■ We also reject defendants' argument that the alleged misstatements were mere "puffery" or "corporate optimism" that is not actionable as securities fraud.[35] *See* Ambac Mem. 14. Although Ambac officers often spoke in general terms about the company's outlook, the defendants also made specific statements that Ambac's CDO portfolio was currently outperforming the market and relevant indices. These statements convey something concrete and measurable about Ambac's financial situation, and a reasonable investor could certainly find them important to the "total mix" of information available.[36]

The CAC also alleges that Ambac's financial disclosure violated GAAP and contained material misstatements with respect to, *inter alia*, Ambac's loss reserves and the mark-to-market accounting of Ambac's CDO exposures. CAC ¶¶ 259–307. Under SFAS 133, as promulgated by the Financial Accounting Standards Board, Ambac was required to report net mark-to-market losses on its CDS contracts in its quarterly SEC filings. CAC ¶¶ 273–76. Plaintiffs'

34. As discussed above with respect to the description of Ambac's underwriting standards as "conservative," once Ambac management compared the company's portfolio to the ABX index, the subject is "in play" and management is bound to speak truthfully. *See Shapiro,* 964 F.2d at 282.

35. Under Second Circuit law, statements of "puffery" are not actionable as securities fraud because investors do not rely on "generalizations regarding integrity, fiscal discipline and risk management." *In re JP Morgan Chase Sec. Litig.,* 363 F.Supp.2d 595, 633 (S.D.N.Y.2005) (citing *Lasker v. N.Y. State Elec. & Gas Corp.,* 85 F.3d 55, 59 (2d Cir. 1996)). Similarly, statements of "corporate optimism" do not give rise to securities violations because "companies must be permitted

to operate with a hopeful outlook." *Rombach v. Chang,* 355 F.3d at 174.

36. Additionally, we reject defendants' argument that their statements are protected by the PSLRA safe harbor under 15 U.S.C. § 78u–5(c)(1). *See* Ambac Mem. 14. This safe harbor applies only to forward-looking statements and does not protect representations of current or historical fact. *See In re Complete Mgmt. Inc. Sec. Litig.,* 153 F.Supp.2d 314, 340 (S.D.N.Y.2001); *see also In re Regeneron Pharm., Inc. Sec. Litig.,* No. 03 Civ. 3111, 2005 WL 225288, at *13 (S.D.N.Y. February 1, 2005). Since defendants' alleged misstatements concern Ambac's current and historical portfolio performance, they do not fall under the protection of the safe harbor.

expert analysis concluded that Ambac was therefore required to write-down the following amounts: (1) $2.1 billion for the quarter ended March 30, 2007, when Ambac in fact announced $5 million; (2) $2.7 billion for the quarter ended June 30, 2007, when Ambac announced $57 million; (3) $8.9 billion for the quarter ended September 30, 2007, when Ambac announced $7 43 million; and (4) $17 billion for the *year* ended December 31, 2007, when Ambac in fact announced $6.1 billion. CAC ¶¶ 141–45. However, Ambac did not restate any of its financial statements and KPMG issued an unqualified audit opinion for Ambac's Form 10–K for the year ended December 31, 2007.[37] CAC ¶ 490.

 Under Second Circuit law, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *Novak*, 216 F.3d at 309. *See also Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir.1999); *Chill v. General Elec.*, 101 F.3d at 270; *In re IMAX Sec. Litig.*, 587 F.Supp.2d 471, 482–83 (S.D.N.Y.2008). However, such allegations may be sufficient if coupled with evidence of "corresponding fraudulent intent."[38] *Chill*, 101 F.3d at 270. In this case, having otherwise found a strong inference of scienter in the actions of defendants, and noting the size and context of the alleged violations, we find the alleged GAAP violations to be actionable.

The parties' disagreements over GAAP compliance also raise issues of fact that cannot be resolved on a motion to dismiss. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir.1997) (reversing 12(b)(6) dismissal because "it is a factual question whether [the company's] accounting practices were consistent with GAAP"); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F.Supp.2d 319, 338–39 (S.D.N.Y.2004) (finding sufficiency of allegations of GAAP violations "cannot be determined in advance of development of the record").

We therefore find that plaintiffs have pleaded material misstatements or omissions regarding Ambac's underwriting standards, portfolio performance, and compliance with GAAP.

### iii. Loss Causation

 Plaintiffs have adequately pleaded loss causation. To satisfy this element, the complaint must provide a causal connection between the misrepresentation and the plaintiffs' loss, and must allege that the company's share price "fell significantly after the truth became known." *Dura Pharms.*, 544 U.S. at 342, 347, 125 S.Ct. 1627. The CAC identifies several corrective disclosures that allegedly demonstrat-

---

**37.** KPMG is not a defendant for plaintiffs' Exchange Act claims, but is a defendant for certain claims under the Securities Act. *See* Part II(a)(ii), *infra*.

**38.** If there is evidence of "corresponding fraudulent intent," GAAP violations may themselves give rise to a strong inference of scienter. *See In re Scottish Re Group Sec. Litig.*, 524 F.Supp.2d 370, 393–94 & n. 174 (S.D.N.Y.2007) (GAAP violation can "weigh in favor of scienter" based on "the number, size, timing, nature, frequency, and context" of the violation); *see also Lewin v. Lipper Convertibles*, No. 03 Civ. 1117, 2004 WL 1077930, at *2 (S.D.N.Y.2004) (GAAP violations supported

finding scienter because "the accounting violations alleged are on such a repeated and pervasive scale that, if proven, they could provide strong circumstantial evidence of recklessness"). When accounting adjustments or write-downs are large enough, this too can support an inference of scienter. *See In Re Atlas Air Worldwide Holdings Securities Litigation*, 324 F.Supp.2d 474, 493–94 (S.D.N.Y.2004). In the present case, both the scale of the alleged GAAP violations and the size of the write-down Ambac announced in January 2008 provide additional support for our finding of a strong inference of scienter. *See* Part I(a)(i), *supra*.

ed the falsity of defendants' previous statements, and also alleges that the value of plaintiffs' Ambac stock declined immediately following the corrective disclosures. In particular, plaintiffs allege that on January 30, 2008, investors were able, for the first time, to identify the specific CDOs Ambac insured and to analyze the collateral for these instruments. CAC ¶¶ 115–16. Plaintiffs further allege that Ambac's announcements on January 16, 2008 and April 22, 2008 each disclosed billions of dollars of losses on Ambac's CDO portfolio and each attributed the company's poor financial results to "underperforming" HELOC and CES securitizations. CAC ¶¶ 245, 320. Such allegations are sufficient at the pleadings stage.

## B. Section 20(a) Claim (Count II)

▇ Section 20(a) of the Exchange Act provides that anyone who "controls" a person liable under Section 10(b) is equally liable, subject only to the defense of "good faith." 15 U.S.C. § 78t(a). In order to establish a prima facie case of liability under section 20(a), plaintiffs must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation. *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998) (internal quotation marks and citation omitted). As discussed above, plaintiffs in this case have pleaded that a primary violation under section 10(b) of the Exchange Act took place, and that defendants Genader and Leonard participated with scienter in the primary violation. Defendants do not contest that Genader and Leonard are "controlling person[s]" within the statute. *See S.E.C. v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1472–73 (2d Cir.1996) ("Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" (quoting 17 C.F.R. § 240.12b–2)). Defendant Leonard was Ambac's CFO at all relevant times, including throughout the Class Period. CAC ¶ 22. Defendant Genader was President, CEO, and Chairman of the Board of Ambac at all relevant times until January 16, 2008. CAC ¶ 21. Leonard and Genader participated in writing or reviewing Ambac's allegedly misleading corporate reports, press releases and SEC filings. CAC ¶ 348. Plaintiffs allege that because of their executive positions, Leonard and Genader were able to control the conduct of Ambac's business, the information contained in its SEC filings and public statements about its business. CAC ¶ 346. The CAC therefore contains sufficient allegations that Leonard and Genader are "controlling person[s]" under section 20(a).

Accordingly, defendants' motion to dismiss the section 20(a) claim is denied.

## II. Claims under the Securities Act

Plaintiffs assert claims under Sections 11, 12, and 15 of the Securities Act against Ambac, certain Individual Defendants, the Underwriter Defendants, and KPMG in connection with Ambac's public securities offerings in February 2007 and March 2008. As discussed below, we find that plaintiffs have stated a claim with respect to Ambac's February 2007 DISCS Offering. However, we find that plaintiffs have failed to state a claim with respect to Ambac's March 2008 offerings because the alleged misstatements in connection with those offerings are not actionable under the "bespeaks caution" doctrine. Accordingly, defendants' motion to dismiss the Securities Act claims is granted in part and denied in part.

As a threshold issue, defendants assert that the Fed.R.Civ.P. 9(b) heightened

pleading standard for fraud claims applies to the Securities Act claims and that, thus, plaintiffs must plead their claims with particularity. The Second Circuit has held that the heightened pleading requirements of Rule 9(b) apply where claims under sections 11 and 12(a)(2) of the Securities Act "sound in fraud"—*i.e.*, where claims are premised on allegations of fraud as opposed to merely negligence.[39] *See Rombach v. Chang*, 355 F.3d at 170–71. When Rule 9(b) applies, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993).

In this case, we need not determine whether plaintiffs' Securities Act claims against Ambac and the Individual Defendants sound in fraud, because plaintiffs have met the Rule 9(b) standard by specifying the "who, what, when, where and how" of the alleged misstatements in connection with Ambac's securities offerings. *Garber v. Legg Mason, Inc.*, 537 F.Supp.2d 597, 614 (S.D.N.Y.2008) (quotation omitted). As for plaintiffs' claims against the Underwriter Defendants and KPMG, these do not sound in fraud. The CAC does not allege that the auditor or the underwriters acted fraudulently; rather, the CAC asserts claims based on "strict liability and/or the absence of an affirmative defense based on the reasonableness of a partial defendant's investigation."[40] CAC

¶¶ 467, 477, 484, 495. Such allegations are sufficient for claims against underwriters or auditors at the pleadings stage. *See Rombach*, 355 F.3d at 178; *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 501–02 (S.D.N.Y.2004).

## A. Section 11 Claims (Counts III and V)

Section 11 of the Securities Act provides strict liability for material misstatements in a Registration Statement for a public securities offering. 15 U.S.C. § 77k. Plaintiffs allege material misstatements in the Registration Statements for Ambac's offerings of DISCS on February 7, 2007, and Equity Units and Common Stock on March 6, 2008.

### i. February 2007 DISCS Offering

#### 1. Claim Not Barred by Statute of Limitations

■ Section 13 of the Securities Act includes a statute of limitations provision that governs claims under Section 11 of the Act. The statute of limitations is established at "one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by reasonable diligence ...." 15 U.S.C. § 77m. Establishing the reasonable discovery date of a securities fraud is a two-step process. First, a court must determine when a reasonable investor could learn of facts sufficient to indicate the probability that he has been defrauded, a circumstance known as "inquiry notice." *Dodds v. Cigna Securities, Inc.*, 12 F.3d 346, 350 (2d Cir.1993), *cert. denied*, 511 U.S. 1019, 114 S.Ct. 1401, 128 L.Ed.2d 74

---

**39.** The legal standard for claims that sound in fraud is discussed in "Pleading Standards— Securities Act Claims," *supra* at 262–63.

**40.** The CAC refers to a "partial defendant" here because only non-issuer defendants, such as KPMG and the Underwriter Defendants, are able to assert an affirmative defense to Securities Act claims based on their reason-

able care or due diligence. 15 U.S.C. §§ 77k(b), 77*l*(a)(2). Generally speaking, defendants bear the burden of demonstrating the applicability of these defenses, which are therefore unavailing as a means of defeating a motion to dismiss pursuant to Rule 12(b)(6). *See, e.g., In re Morgan Stanley*, 592 F.3d at 360 n. 7.

(1994). The circumstances triggering "inquiry notice" are referred to as "storm warnings." *Id.* However, "storm warnings" do not place investors on inquiry notice when accompanied by " 'reliable words of comfort from management' such that an investor of ordinary intelligence would reasonably have relied on the statements to allay his or her concern." *In re Alcatel Sec. Litig.*, 382 F.Supp.2d 513, 527 (S.D.N.Y.2005) (quoting *LC Capital Partners LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 155 (2d Cir.2003)). If a defendant has shown that a duty to inquire arose, a court must take the second step of assessing when, "in the exercise of reasonable diligence, [the plaintiff] should have discovered the facts underlying the alleged fraud." *Rothman v. Gregor*, 220 F.3d 81, 97 (2d Cir.2000). The limitations period then begins to run from that moment of constructive notice.

In this case, defendants contend that plaintiffs were on inquiry notice of the alleged misstatements in Ambac's DISCS Offering documents prior to July 25, 2007, one year before the filing of the suit.[41] Ambac Mem. 35–37. Defendants identify various "storm warnings" that they claim put plaintiffs on notice of Ambac's allegedly lowered underwriting standards and underperforming CDO portfolio. These storm warnings include: (1) questions from Ambac's investors expressing concern about the company's mortgage-related exposures at conferences held in March and June 2007,[42] (2) a May 2007 MarketWatch article citing a report by well-known short-seller Bill Ackman,[43] who publicly said that Ambac was overpriced, and (3) losses in the mortgage portfolio at Countrywide[44] (once the largest mortgage originator in the United States) that were disclosed on July 23, 2007.

■ However, the CAC describes numerous statements of "comfort" by Ambac officers who sought to alleviate investor concerns about these supposed storm warnings. *In re Alcatel*, 382 F.Supp.2d at 527 (inquiry notice not triggered if storm warnings are negated by words of comfort from management). For example, at the investor conferences held in March and June of 2007, defendant Uhlein said "[Ambac has] maintained the same conservative standards over the years" and "a little turmoil in the market, to be honest, that's actually a good thing for financial guarantors." CAC ¶¶ 173, 188. It is clear that a reasonable investor could have relied on such statements to allay their concerns about Ambac's underwriting and portfolio performance. Indeed, it is partially these words of reassurance by Ambac management that form the basis for plaintiffs' lawsuit alleging fraud under the Exchange Act. Defendants' argument that plaintiffs were on inquiry notice before July 25, 2007, implies that Ambac's investors should have been aware of the company's financial troubles at a time when Ambac's own officers deny knowing that anything was wrong. *See* Pls. Opp'n Mem. 69. While we acknowledge the permissibility of arguing in the alternative under the Federal Rules,[45] this glaring contradiction

---

**41.** The relevant date for statute of limitations purposes is the day on which any plaintiff in this consolidated action first filed a complaint asserting claims relating to the February 2007 DISCS Offering. *See* Fed.R.Civ.P. 15(c)(2). Named plaintiff Painting Industry filed a complaint on July 25, 2008, asserting Securities Act claims related to the DISCS offering. *See* Wilson Decl. Ex. 27.

**42.** *See* Wilson Decl. Ex. 56 at 5–7; Ex. 57 at 4–6.

**43.** *See* Wilson Decl. Exs. 15–16.

**44.** *See* CAC ¶ 95.

**45.** *See* Fed.R.Civ.P. 8(d)(2).

exposes defendants' inquiry notice argument as trivial at best.

Since defendants have failed to show that plaintiffs were on inquiry notice more that one year prior to filing suit, their statute of limitations argument is unavailing.[46]

### 2. Material Misstatement or Omission

 We find that plaintiffs have adequately pleaded a material omission in the Registration Statement for the February 2007 DISCS Offering. Although it is a close question, plaintiffs' allegation that Ambac failed to disclose its lowered underwriting requirements meets the standard for pleading a material omission since it cannot be said that the omission was "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance." *Goldman v. Belden,* 754 F.2d at 1067 (finding that a complaint may not be dismissed on the basis of immateriality of omissions unless the omissions meet this standard). For an investor viewing the DISCS Registration Statement, including the documents incorporated by reference, the disclosure of this fact would have been "necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a).

At Oral Argument, and in their subsequent letters to the Court dated December 18 and December 28, 2009, counsel for the Underwriter Defendants argued that plaintiffs have failed to identify a statement that is rendered misleading by the alleged omission. Oral Argument Tr. 82. In their letters, the parties discuss at length the question of when or whether Section 11 provides liability for a "pure omission." *See id.* However, in this case,

we need not address the issue. The DISCS Offering documents describe Ambac's underwriting standards in positive terms, placing the subject "in play" so that failure to disclose a lowering of those standards would be misleading. *See Shapiro v. UJB,* 964 F.2d at 282. For example, Ambac's 2005 10–K, incorporated by reference into the DISCS Registration Statement, states that "[u]nderwriting guidelines, policies and procedures have been developed by Ambac Assurance's management with the intent that Ambac Assurance guarantees only those obligations which, in the opinion of Ambac Assurance underwriting officers, are of investment grade quality with a remote risk of loss" and that "[t]he underwriting process involves review of structural, legal, political and credit issues, including compliance with current Ambac Assurance underwriting standards." [47] *See* Wilson Decl., Ex. 31 at 10. Since Ambac's disclosure documents characterize the company's underwriting standards in these terms, a reasonable investor could find the lowering of those standards important to the "total mix" of information available. *See TSC Indus.,* 426 U.S. at 449, 96 S.Ct. 2126.

 Defendants also argue that the alleged misstatements or omissions in Ambac's DISCS Offering documents are protected by the "bespeaks caution" doctrine. Ambac Mem. 34–35; Underwriters Mem. 8. The judicial "bespeaks caution" doctrine renders certain alleged misrepresentations immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering. *Halperin v. eBanker*

---

46. Our decision is based on the present record, and does not preclude the possibility that, at a later stage in the litigation, defendants will be able to present further facts demonstrating inquiry notice.

47. Although plaintiffs do not identify this language in the CAC, the Court may take notice of legally required public disclosure documents, filed with the SEC, on a motion to dismiss. *See ATSI Commc'ns,* 493 F.3d at 98.

*USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).[48] For cautionary language to be adequate, it "must precisely address the substance of the specific statement or omission that is challenged." *City of Sterling Heights Police and Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F.Supp.2d 348, 356 (S.D.N.Y.2006) (quotation omitted); *Steinberg v. PRT Group, Inc.*, 88 F.Supp.2d 294, 301 (S.D.N.Y.2000).

We find defendants' bespeaks caution argument to be unavailing with respect to the DISCS Offering. The DISCS Registration Statement did not contain language to warn investors specifically about the risks resulting from looser underwriting requirements for guaranteeing RMBS-related products. We recognize that the Registration Statement did contain a "Risk Factor" anticipating unforeseen risks:

> *"Our risk management policies and practices may not anticipate unforeseen risks and/or the magnitude of potential for loss as the result of foreseen risks* ... [Ambac's] underwriting policies and practices ... are based in part on models reflecting historical factors, e.g. default rates and severity of loss experience."

Prospectus Supplement for DISCS Offering, filed February 7, 2007, at S–10 (emphasis in original); *see* Wilson Decl., Ex. 60. However, this language does not directly address the risk pertaining to Ambac's alleged omission, *i.e.* the potential consequences of lowering underwriting standards for guaranteeing RMBS and CDOs. Indeed, the DISCS Registration Statement contained no statement disclosing the additional risk imposed by Ambac's guarantees of RMBS and CDOs. *See* CAC ¶ 171.

We therefore find that plaintiffs have pleaded a material omission in the February 2007 DISCS Registration Statement.

### ii. March 2008 Offerings

 Plaintiffs also bring claims under Section 11 of the Securities Act alleging material misstatements and omissions in the Registration Statements for Ambac's Equity Units Offering and Common Stock Offering, both of which occurred on March 6, 2008. CAC ¶¶ 409–66. We find, for the reasons below, that plaintiffs have failed to plead material misstatements in the relevant offering documents and therefore we grant defendants' motion to dismiss Count V.[49]

The Registration Statements for the March 2008 Offerings incorporate by reference Ambac's SEC filings, including Ambac's Form 10–Ks, 10–Qs and 8–Ks filed during the Class Period. The CAC identifies numerous statements in these documents that are allegedly rendered misleading due to (1) Ambac's lowered underwriting standards, (2) deterioration in the performance of Ambac's CDO portfolio, in line with the pertinent market indices, and (3) Ambac's misstatement of its financials and failure to comply with GAAP.[50] *See* CAC ¶¶ 416, 418, 423. De-

---

**48.** The PSLRA also contains a safe harbor for forward-looking statements accompanied by adequate cautionary language. 15 U.S.C. 77z–2(c). Defendants' alleged omission falls plainly outside the safe harbor as it is not a forward-looking statement.

**49.** We do not address or make any ruling on defendants' argument that plaintiffs lack standing to bring claims relating to the Equity Units Offering. *See* Ambac Mem. 40. Since we find that plaintiffs have failed to plead

material misstatements for that offering, the standing issue need not be resolved.

**50.** The allegations of misstatements in these documents largely parallel plaintiffs' allegations of fraud under the Exchange Act. However, for Securities Act purposes, the universe of alleged misstatements is limited to those in the Registration Statements or Prospectuses, and the SEC filings incorporated by reference therein. *See* 15 U.S.C. § 77k.

fendants argue that the events that transpired at Ambac prior to the March 2008 offerings render the alleged misstatements immaterial as a matter of law because no reasonable investor could have been misled based on the "total mix" of information available, and because the offering documents "bespoke caution." Ambac Mem. 38–39; KPMG Mem. 10–13. We agree.

On January 16, 2008, Ambac announced a $5.4 billion mark-to-market loss on its CDO portfolio for the fourth quarter of 2007—an amount that represented more than Ambac's earnings for the four previous years combined—as well as an impairment charge of over $1 billion and the sudden resignation of Genader as CEO. CAC ¶¶ 8, 315. This announcement, in the words of plaintiffs' own brief, "shocked investors" and caused them to "realize that Ambac's underwriting could not have been strict, conservative or rigorous, and that, despite the Exchange Act defendants' repeated and emphatic statements to the contrary, Ambac's RMBS related exposures have performed no better than the rest of the mortgage market." Pls. Opp'n Mem. 15–16. On January 18, two days later, Ambac's stock price had fallen to $6.24 per share, compared to a Class Period high of $96.08 in May 2007. CAC ¶¶ 8, 316–17. By the time of the March 2008 Offerings, Ambac's credit rating had been downgraded by Fitch and placed on review for a possible downgrade by both Moody's and S & P. CAC ¶ 42.

After such drastic disclosures and the company's financial struggles that followed, it is clear that no reasonable investor could have been misled about the risks from Ambac's underwriting policies or the performance of the company's CDO portfolio. Indeed, plaintiffs admitted as much in their own submissions to the Court, as quoted above. Pls. Opp'n Mem. 15–16. Thus, plaintiffs have failed to allege material misstatements that are actionable under the "total mix" standard set forth by the Supreme Court. *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126.

■■■ Furthermore, the alleged misstatements are protected by the "bespeaks caution" doctrine because the March 2008 Offering documents contained adequate cautionary language.[51] The "Risk Factors" section of the Prospectus Supplements, filed in conjunction with the March 2008 Offerings, warned that the actions of the ratings agencies have "had a material adverse effect on [Ambac's] competitive position and [Ambac's] ability to write new business" and that Ambac has "written virtually no new business thus far in 2008." *See* Prospectus Supplement for Equity Units Offering, s–29 to s–41; Prospectus Supplement for Common Stock Offering, s–7 to s–22. Another risk factor disclosed that Ambac was "subject to credit risk and other risks related to RMBS and CDOs of ABS" and specifically mentioned Ambac's HELOC and CES transactions, noting that "further deterioration in performance of the subprime mortgage sector is generally expected." *Id.* Another risk factor stated: "Our underwriting and risk management policies and practices in the past have not anticipated unforeseen risks and/or the magnitude of potential for loss as the result of foreseen risks."[52] *Id.*

---

**51.** The bespeaks caution doctrine was defined in Part II(a)(i) (2), *supra*.

**52.** We note the difference in verb tenses between this Risk Factor and that included in the February 2007 DISCS Offering documents, quoted above in Part II(a)(i)(2). The

earlier language warned of risk management practices that *"may not* anticipate unforeseen risks" (emphasis added), while the revised language describes practices that have already failed in past. It is clear that the revised language sends a far stronger message of caution to investors.

When cautionary language is present, the bespeaks caution doctrine invites courts first to "identify the allegedly undisclosed risk," and then to "analyze the allegedly fraudulent materials in their entirety to determine whether a reasonable investor could have been misled." *Halperin*, 295 F.3d at 357. In the present case, the allegedly undisclosed risk is that the investors in Ambac's March 2008 Offerings might lose money resulting from the poor performance of Ambac's insured portfolio, which in turn might be caused by Ambac's allegedly lowered underwriting standards. However, the graphic risk disclosures excerpted above put investors on notice that (1) Ambac had guaranteed risky products exposed to the severely troubled and deteriorating subprime mortgage market, (2) Ambac's underwriting practices had failed to identify the risks of those products, and (3) Ambac was now in a very weak financial position. We therefore find that no reasonable investor could have been misled about his or her investment in Ambac. *See Halperin*, 295 F.3d at 360 (affirming dismissal of complaint where offering memoranda "not only bespeak caution, they shout it from the rooftops").

Plaintiffs argue that the alleged misstatements in Ambac's financial statements, and the corresponding GAAP violations, are not protected by the bespeaks caution doctrine because the doctrine only applies to forward-looking statements. Indeed there is Second Circuit precedent stating that the bespeaks caution doctrine applies only to "forward-looking, prospective" representations or omissions concerning such topics. *See P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96–97 (2d Cir.2004) (following other circuits in limiting the "bespeaks caution" doctrine to "forward-looking, prospective representations"); *Heller v. Goldin Restructuring Fund, L.P.*, 590 F.Supp.2d 603, 617 (S.D.N.Y.2008) (noting that the bespeaks caution doctrine "only applies to forward-looking statements, and not to misrepresentations of present or historical fact"); *Scantek Med., Inc. v. Sabella*, 583 F.Supp.2d 477, 496 (S.D.N.Y.2008) (observing that bespeaks caution doctrine applies to "forward-looking statements"). However, even after the Second Circuit adopted the forward-looking limitation in *P. Stolz*, courts in the Second Circuit have continued to apply the bespeaks caution doctrine without considering whether the alleged misrepresentations or omissions were forward-looking or dealt with historical or present facts. *See, e.g., Rombach*, 355 F.3d at 172–74 (2d Cir.2004) (finding that alleged failure to disclose integration and liquidity problems was protected by the bespeaks caution doctrine); *Coronel v. Quanta Capital Holdings, Ltd.*, No. 07 Civ. 1405, slip op. at 17–18 (S.D.N.Y. Jan. 26, 2009) (applying the bespeaks caution doctrine to loss estimates in a prospectus and registration statement); *see also Rubin v. MF Global, Ltd.*, 634 F.Supp.2d 459, 467–68 (S.D.N.Y.2009) (collecting cases in which bespeaks caution is applied to protect statements that are not forward-looking). We proceed by following the broader reading of bespeaks caution adopted by this line of cases.

In the present case, plaintiffs allege that Ambac's financial statements are misleading in that they understate the value of Ambac's mark-to-market losses and credit impairments. The allegedly undisclosed risk to investors, therefore, is that these losses and impairments might end up being larger than recorded in Ambac's financial statements. However, the offering documents include a Risk Factor to warn investors that there is substantial disagreement about these aspects of Ambac's financial statements: "Various third-party market participants, including several underwriters in this offering and in the concurrent Equity Units Offering, have made estimates of our losses, estimates of credit

impairments and mark-to-market losses that in some cases materially exceed the amounts we have reported." *See* Prospectus Supplement for Equity Units Offering, s–32; Prospectus Supplement for Common Stock Offering, s–9. This cautionary language "precisely address[es]" the allegedly undisclosed risk and is therefore adequate to invoke the protection of the bespeaks caution doctrine. *City of Sterling Heights,* 423 F.Supp.2d at 356.

For the reasons above, we find that defendants' alleged misstatements in the Registration Statements for the March 2008 Offerings are protected by the bespeaks caution doctrine and are immaterial as a matter of law.

### B. Section 12(a)(2) Claim (Counts IV and VI)

Section 12(a)(2) of the Securities Act provides strict liability for material misstatements in a Prospectus circulated in connection with a public securities offering. 15 U.S.C. § 77*l* (a)(2). Each of Ambac's securities offerings during the Class Period were accompanied by a Prospectus Supplement which contained or incorporated by reference the same material misstatements or omissions discussed in Part II(a), above. CAC ¶ 479. Accordingly, we deny defendants' motion to dismiss Count IV (relating to the February 2007 DISCS Offering) and grant defendants' motion to dismiss Count VI (relating to the March 2008 Offerings).

### C. Section 15 Claim (Count VII)

Section 15 of the Securities Act makes liable those officers "who control[ ] any person liable under Section 11 or 12(a)(2)," subject only to the defense of "good faith." 15 U.S.C. § 77*o*. Plaintiffs assert claims under Section 15 against defendants Genader and Leonard in connection with the February 2007 DISCS Offering and against defendants Leonard and Callen in connection with the March 2008 Offerings. The CAC alleges, and it is not disputed,

that these defendants were controlling persons within the meaning of Section 15. Since we find that plaintiffs sufficiently pleaded an underlying Securities Act claim with respect to the DISCS Offering, defendants' motion to dismiss is denied with respect to Genader and Leonard. Since we find that plaintiffs failed to plead an underlying Securities Act violation with respect to the March 2008 Offering, defendants' motion to dismiss is granted with respect to defendant Callen and defendant Leonard's liability is limited to the February 2007 DISCS Offering only.

### CONCLUSION

For the reasons stated above, defendants' motion to dismiss under Rule 12(b)(6) is granted in part and denied in part. Plaintiffs have adequately alleged claims under the Exchange Act and claims under the Securities Act with respect to Ambac's February 2007 DISCS Offering. However, plaintiffs have failed to plead claims under the Securities Act with respect to Ambac's March 2008 Offering. Accordingly, defendants' motion to dismiss is granted as to Counts V and VI, as well as Count VII with respect to defendant Callen only. Defendants' motion to dismiss is denied as to Counts I, II, III, and IV, and Count VII as it relates to defendants Genader and Leonard with respect to the February 2007 DISCS Offering.

**IT IS SO ORDERED.**

### MEMORANDUM AND ORDER

Plaintiffs brought this securities class action against Ambac Financial Group, Inc. ("Ambac"), several of Ambac's officers and directors, and the underwriters of certain Ambac securities offerings. On August 27, 2009, defendants moved to dismiss plaintiffs' Consolidated Amended Class Action Complaint ("CAC") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Pro-

cedure. On February 22, 2010, we issued an order granting defendants' motion in part and denying it in part. *In re Ambac Fin. Group, Inc. Sec. Litig.*, No. 08 Civ. 411(NRB), 693 F.Supp.2d 241, 2010 WL 727227 (S.D.N.Y.). The order sustained plaintiffs' fraud claims under the Exchange Act of 1934 and sustained plaintiffs' claims under the Securities Act of 1933 as they related to Ambac's February 2007 securities offering. We also dismissed plaintiffs' Securities Act claims that related to Ambac's March 2008 securities offerings on the grounds that the alleged misstatements in the offering documents were protected by the "bespeaks caution" doctrine.

Now pending before the Court is defendants' motion pursuant to 28 U.S.C. § 1292(b) to certify our order for interlocutory appeal. For the reasons set forth below, defendants' motion is denied.

## LEGAL STANDARD

▪ Under 28 U.S.C. § 1292(b), the party seeking certification must establish that the order appealed from (1) "involves a controlling question of law," (2) as to which there is a "substantial ground for difference of opinion," and (3) "that an immediate appeal would materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). This last factor is particularly important. *Consub Delaware, LLC v. Schahin Engenharia Limitada*, 476 F.Supp.2d 305, 310 (S.D.N.Y. 2007) (citing *Koehler v. Bank of Bermuda, Ltd.*, 101 F.3d 863, 865–66 (2d Cir.1996) ("The use of § 1292(b) is reserved for those cases where an intermediate appeal may avoid protracted litigation.")).

▪ Interlocutory appeals are strongly disfavored in federal practice. *See, e.g., In re Adelphia Communications Corp.*, Nos. 02–41729(REG), 07 Civ. 9999(NRB), 2008 WL 361082, at *1 (S.D.N.Y. Feb. 7, 2008). Movants cannot invoke the appellate process "as a vehicle to provide early review of difficult rulings in hard cases." *In re Levine*, No. 94–44257, 2004 WL 764709, at *2 (S.D.N.Y. Apr. 9, 2004) (quoting *German v. Federal Home Loan Mortgage Corp.*, 896 F.Supp. 1385, 1398 (S.D.N.Y.1995)). Only "exceptional circumstances" will justify a departure from the basic policy of avoiding appellate review until a final decision on the merits. *Williston v. Eggleston*, 410 F.Supp.2d 274, 276 (S.D.N.Y.2006) (quoting *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir.1990)); *accord Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 95 (2d Cir.1997).

Furthermore, the Second Circuit has held that challenges to the sufficiency of a pleading are not generally the appropriate subjects of interlocutory review unless they present difficult questions of substantive law. *In re Manhattan Inv. Fund Ltd.*, 288 B.R. 52, 56–57 (S.D.N.Y.2002) (citing *Gottesman v. General Motors Corp.*, 268 F.2d 194, 196 (2d Cir.1959)).

## DISCUSSION

Our 81–page opinion addressing defendants' motion to dismiss was issued after extensive briefing and oral argument by the parties. We concluded, therein, that plaintiffs had successfully pled scienter with respect to Ambac and each of the individual defendants named in plaintiffs' fraud claim. More specifically, we found sufficient plaintiffs' detailed allegations that the individual defendants (a) knew about and approved Ambac's lowered underwriting standards while publicly touting the company's "cautious" and "conservative" approach to underwriting, and (b) learned of the deterioration of Ambac's insured portfolio of mortgage-related derivatives, while making public statements that Ambac was outperforming the market and would suffer only minimal losses. *In re Ambac*, 693 F.Supp.2d at 264–70, 2010 WL 727227, at *17–22.

Defendants seek certification for interlocutory appeal for three legal questions, which we now consider in turn.

### I. Confidential Witnesses and Experts

Plaintiffs' allegations of fraud in this case included statements by confidential witnesses, each of whom was identified in the CAC by their title, role and dates of employment at Ambac. These confidential witnesses described specifically how Ambac had lowered its underwriting standards during the relevant period. On the subject of Ambac's insured portfolio, the CAC contained the findings of confidential experts that purported to value the mortgage-related financial instruments Ambac had insured. The CAC used the experts' findings to illustrate that the derivatives in Ambac's portfolio were deteriorating in line with the relevant market indices at a time when Ambac's officers claimed that the portfolio was outperforming those indices.

▆▆▆ Defendants contend on this motion that the Second Circuit should be given the opportunity to address the "weight, if any, [that] should be given to statements by confidential witnesses or conclusions of confidential experts." Memorandum in Support of Defendants' Motion for Certification ("Defs. Mem.") 1. This issue fails to meet the standard for interlocutory appeal under § 1292(b) on multiple, independent grounds.

First, defendants have not shown that there is "substantial ground for difference of opinion" on the weight to be given to statements by confidential witnesses. The Second Circuit's controlling decision in *Novak v. Kasaks*, 216 F.3d 300 (2d Cir.2000), permits plaintiffs to rely on confidential sources provided they are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." 216 F.3d at 314. Courts in the Southern District routinely apply the rule in *Novak,* and have continued to do so following the Supreme Court's recent decisions [1] establishing stricter pleading requirements. *See, e.g., Cornwell v. Credit Suisse Group,* 689 F.Supp.2d 629, 636–37 (S.D.N.Y.2010); *In re Dynex Capital, Inc. Sec. Litig.,* No. 05 Civ. 1897(HB), slip op. at 7, 13, 2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009); *In re NovaGold Resources Inc. Sec. Litig.,* 629 F.Supp.2d 272, 298 & n. 14 (S.D.N.Y. 2009).[2] Even the Seventh Circuit's decision in *Higginbotham v. Baxter Int'l, Inc.,* 495 F.3d 753, 756–57 (7th Cir.2007), upon which defendants principally rely, was severely limited when that court decided the *Tellabs* case on remand from the Supreme Court. *Makor v. Tellabs,* 513 F.3d 702, 712 (7th Cir.2008) (holding that, while it would be better to have named sources, "the absence of proper names does not invalidate the drawing of a strong inference from [the confidential witnesses]' assertions"), *on remand from,* 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).[3]

1. *See Ashcroft v. Iqbal,* ─── U.S. ───, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

2. We note additionally that nothing in defendants' submission of supplemental authority relevant to this issue—the full extent of which was a single footnote in a summary order—

places in question the Second Circuit's holding in *Novak. See Campo v. Sears Holdings Corp.,* No. 09–3589–cv, ─── Fed.Appx. ───, ─── n. 4, 2010 WL 1292329, at *3 n. 4 (2d Cir. April 6, 2010) (Summary Order); Defs. Notice of Supplemental Authority, dated April 6, 2010.

3. We also reject defendants' argument that plaintiffs cannot rely on the conclusions of confidential experts to overcome a motion to

Second, it is clear that the resolution of this issue in defendants' favor would not "materially advance the ultimate termination of the litigation" as required by 28 U.S.C. 1292(b). Rather, such a decision would presumably require plaintiffs to amend their complaint with the names of their sources. *See Gottesman,* 268 F.2d at 196 (interlocutory appeal not appropriate when "a reversal at most could lead only to a remand for repleading, with possibilities of further interlocutory appeals thereafter").

## II. Pleading Contradictory Reports To Establish Scienter

We concluded in our February 22 opinion that plaintiffs had pled scienter by alleging that the individual defendants' statements were contradicted by internal reports at Ambac. *In re Ambac,* 693 F.Supp.2d at 264–70, 2010 WL 727227, at *17–22. The CAC identified a number of documents from which the individual defendants would have learned of Ambac's allegedly lowered underwriting standards and allegedly deteriorating insured portfolio.

 Defendants seek interlocutory review of whether plaintiffs must state "with specificity the information that was actually contained in allegedly contradictory reports that were received by executives in order to create a strong inference of scien-

ter." Defs. Mem. 1. The Second Circuit held in *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.* that "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." 531 F.3d 190, 196–97 (2d Cir.2008) (quoting *Novak,* 216 F.3d at 309).

This issue does not present a "controlling question of law" in this case because in multiple instances plaintiffs did plead the actual contents of contradictory reports. 28 U.S.C. 1292(b). Rather, defendants were simply dissatisfied with our legal conclusion that plaintiffs have satisfied the *Dynex* pleading standard. As described at length in our opinion, the CAC supported a strong inference of scienter because the individual defendants' statements about Ambac's underwriting standards were contradicted by information "actually contained" in Ambac's internal documents. For example, the CAC described a memo to the credit risk committee that detailed a reduction in the required overcollateralization for "HELOC" deals from 3.5% to 0.5%. *In re Ambac,* 693 F.Supp.2d at 267–68, 2010 WL 727227, at *20. This allegation, viewed alongside other specific pleadings about the contents of key internal documents, was sufficient to support an inference of scienter.[4] We

---

dismiss because such expert testimony would not survive a *Daubert* challenge. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). There is no authority for the proposition that a court need perform its *Daubert* gatekeeping function at the pleadings stage.

**4.** Defendants' present motion focuses on a different set of reports that conveyed the allegedly deteriorating value of Ambac's insured portfolio during the class period. Having noted that these reports are not necessary for our finding of scienter, we also reject defendants' argument that there is substantial

ground for difference of opinion over whether the pleadings about those reports satisfy the *Dynex* standard. In *Dynex,* the Second Circuit was concerned that plaintiffs' "broad reference to raw data lacks even an allegation that these data had been collected into reports." 531 F.3d at 196. In this case, however, Ambac officers themselves described the "monthly downloads" by which they learned of the insured portfolio's performance, leaving no doubt that the individual defendants had actual knowledge of the documents containing allegedly contradictory information. *See In re Ambac,* 693 F.Supp.2d at 268–69, 2010 WL 727227, at *21.

therefore find that defendants' second question is not one of controlling law.

### III. Material Omission in Ambac's February 2007 Offering

With respect to plaintiffs' Securities Act claims, our February 22 opinion held that plaintiffs had alleged sufficient facts to establish a material omission in the offering documents for Ambac's February 2007 securities offering. The offering documents made reference to Ambac's underwriting procedures, developed "with the intent that" Ambac only insured securities "of investment grade quality with a remote risk of loss." [5] In light of statements such as this, we found that Ambac's nondisclosure of its allegedly lowered underwriting standards satisfied the low burden for materiality applicable on a motion to dismiss. *See In re Ambac,* 693 F.Supp.2d at 277, 2010 WL 727227, at *28.

 Defendants' final argument, while artfully phrased, is at bottom simply a disagreement with our conclusion as to the materiality of Ambac's alleged omission.[6] The materiality of Ambac's nondisclosure of its allegedly lowered underwriting standards is a mixed question of law and fact, rendering it inappropriate for interlocutory review. *See In re Worldcom, Inc.,* No. M–47 HB, 2003 WL 21498904, at *10 (S.D.N.Y. June 30, 2003) (§ 1292(b)

appeal requires "a 'pure' question of law that the reviewing court 'could decide quickly and cleanly without having to study the record' ") (quoting *Ahrenholz v. Bd. of Trs. of Univ. of Illinois,* 219 F.3d 674, 676–77 (7th Cir.2000)).

### CONCLUSION

For the reasons set forth above, we find that defendants have failed to show that the requirements of 28 U.S.C. § 1292(b) are met. Moreover, defendants have not established any "exceptional circumstances" that would warrant interlocutory review in this case.[7] *See Williston,* 410 F.Supp.2d at 276. Accordingly, defendants' motion to certify our February 22, 2010 order for interlocutory appeal is denied.

### IT IS SO ORDERED.

---

**5.** Ambac's Form 10–K for the year ended December 31, 2005.

**6.** " 'A mere claim that a district court's decision was incorrect does not suffice to establish substantial ground for a difference of opinion.' " *In re Citigroup Pension Plan ERISA Litig.,* No. 05 Civ. 5296(SAS), 2007 WL 1074912, at *2 (S.D.N.Y. April 4, 2007) (quoting *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas,* 426 F.Supp.2d 125, 129 (S.D.N.Y.2005)).

**7.** Defendants argue that a § 1292(b) appeal is the only vehicle by which the Second Circuit

will be able to address the various legal questions defendants raise. We disagree. While we certainly do not dispute that the questions defendants seek to raise on an interlocutory basis will not be resolved in this case in the absence of our grant of defendants' application, it is not the case that these issues will never be resolved. Issues relating to the sufficiency of pleadings will continue to be resolved by the Circuit in other cases when plaintiffs appeal from the grant of motions to dismiss. The law of securities fraud pleading has been developed in this manner for some time.